### ARGUED AND DETERMINED

##### IN THE

## SUPREME COURT OF ERRORS

##### OF THE

## STATE OF CONNECTICUT.

~~~~~~~~~~~~~~~~~~~~

### LEAVITT *against* BEIRNE and others. (a)

The testator died in *March*, 1845, having previously disposed of his estate by will as follows. After giving some small legacies, he declared, that the residue of his property, real and personal, should be divided equally among his children; and that the share of his daughter *M* should be for the exclusive use of her and her children, free from the debts and controul of her husband; and to secure the same to their unimpaired enjoyment, he gave such share to his sons *G* and *O*, with full authority to apply the property as to them should seem best for their exclusive benefit, during the life of *M*, and after her decease, to divide the same among her children. The estate left by the testator amounted to 500,000 dollars, of which *M's* share under the will was 83,000 dollars. She was then married to *S*, by whom she had six children, who, at the time of the hearing, were from twenty-two to three years of age. *S*, with his wife and children, were at house-keeping in the city of *New-York*, until a short time before the testator's death, when, failing in business, he went with his family to board in a hotel. In *March*, 1846, with a view of resuming house-keeping, an arrangement was made with the plaintiff, by which furniture of the value of 6,856 dollars was procured for the use of the family, for which *M*, by the advice of her husband, gave her promissory note to the plaintiff for 5,589 dollars, payable, on the 1st of *September* following, from funds to be received from her father's estate. The furniture thus procured, though not essentially necessary, was not extravagant

(a) This case was not decided until the meeting of the judges in *November*, 1850, and their opinions were not prepared in season to be inserted with the other cases argued at the same term.

*Fairfield,*
August, 1850.

Leavitt
*v.*
Beirne.

or unreasonable. The trustees accepted the trust under the will; but when the note was given by *M*, they had not advanced anything from the estate, nor had they authorised her to make any contracts which should affect the trust fund in their hands. After the note became due, it was presented to one of the trustees for payment. He objected neither to the purchase of the furniture nor the payment of the note, but declined payment for want of funds then in his hands. The other trustee had not, at that time, any knowledge of the purchase or of the note. Large and ample funds have since been placed subject to her controul. On a bill in chancery brought against the trustees to compel payment of the note from the trust fund in their hands, it was held, that the property given by the testator to his two sons in trust for the benefit of *M* and her children, was not so given as to be subject to her controul, and liable to be bound by her contracts, but the trustees had not only the legal title and custody of the property, but were clothed with authority to apply it according to their discretion, for the purpose specified; consequently, the court refused to interfere with the exercise of their discretion, until it should be shewn that there had been some abuse of their authority. [Two judges dissenting.]

THIS was a bill in chancery, brought to compel the payment of a promissory note, executed by *Mary D.*, the wife of *John B. Steenbergen*, out of property holden by her brothers, *George P. Beirne* and *Oliver Beirne*, under the will of their father, in trust for her and her children.

The cause came on for trial at the *February* term, 1850, of the superior court for the county of *Fairfield*, when the following facts were found by the court.

*Andrew Beirne* of *Virginia* died in *March*, 1845, having, a short time previously, made his will, by which, after the bequest of a few small legacies, he disposed of his estate in the following manner:

" The balance of my property, real and personal, to be divided equally among my children, subject to the following provisions and conditions, that is to say, that my son *Andrew Beirne* is to have a life interest only in his portion of my estate, and that, after his death, to be equally divided among his children and their descendants. All and every of the property given to my daughter, *Mary D. Steenbergen*, is for the exclusive use of her and her children, free from the debts and controul of her husband; and to secure the same to their unimpaired enjoyment, I hereby give the same to my sons, *George P. Beirne* and *Oliver Beirne*, with full authority to apply the property as to them shall seem best, for their exclusive benefit, during the life of my said daugh-

ter, and after her decease, to divide the same equally among her children ;" and he appointed these two sons executors of the will.

The testator left a large estate, amounting to more than 500,000 dollars, and the share allotted to Mrs. *Steenbergen* under the will, was about 83,000 dollars. She had married *John B. Steenbergen*, and by him had six daughters still living, the eldest of whom, at the time of the hearing, was about twenty-two, and the youngest about three years of age.

In the spring of 1844, *Steenbergen* purchased of *J. W. Leavitt* a large and valuable house in the city of *New-York*, for 21,000 dollars, then under the incumbrance of a mortgage to the plaintiff for 20,000 dollars, upon which purchase he paid 6,000 dollars, and assumed the balance of the plaintiff's mortgage, amounting to 15,000 dollars. He also purchased of *Leavitt* furniture, to the amount of 6,000 dollars, and, with his family, moved into the house, and lived there until a short time before the death of the testator, when he failed in business, and went, with his family, to board in a hotel.

In *December*, 1844, he assigned the house and furniture to *J. W. & R. Leavitt*, to whom he was largely indebted ; and the furniture was subsequently assigned to the plaintiff. Soon after the death of the testator, *Steenbergen* applied to *J. W. Leavitt*, as the agent of the plaintiff, to redeem the house and furniture, with a view of resuming house-keeping ; and *Leavitt*, as the agent of the plaintiff, proposed that the mortgage of the plaintiff should be reduced to 12,000 dollars, and that Mrs. *Steenbergen* should, from the funds to be received from the estate of her father, pay for the furniture, and receive the same. This proposition was made known to her, to which she, at the suggestion and by the advice of her husband, agreed.

*Steenbergen* then procured one *Hunt* to assume the payment of the mortgage of 12,000 dollars, and for the balance, being then 3,589 dollars, 70 cents, she, on the 28th of *March*, 1846, at the suggestion and by the advice of her husband, made her note to the plaintiff, payable on the 1st day of *September* following, to be by her husband delivered to the plaintiff, and to be paid from the funds to be received from the estate of her father. In consideration of this note,

*Fairfield,*
August, 1850.

Leavitt
*v.*
Beirne.

she was to receive the furniture, amounting to the sum of 6,856 dollars, 68 cents. The plaintiff thereupon conveyed the house to *Hunt,* and the furniture was given to Mrs. *Steenbergen,* or to the family, without any written assignment; and the family went into the use and occupation of the same.

Hunt soon after occupied the house, and purchased either of *Steenbergen* or his wife, or both, a portion of the furniture, sufficient to furnish two parlours, and less in value than one-half of the same. *Steenbergen* soon afterwards removed with his family to *Southport* in *Connecticut,* and occupied a dwelling-house, furnished with the furniture purchased of the plaintiff. It was found by the court, that furniture to the amount of the note, was not essentially necessary for the comfort and convenience of Mrs. *Steenbergen* and her family; but that in the city of *New-York,* it was usual for families of no greater wealth to furnish their houses with furniture of equal or greater value, and that this was not extravagant, nor unreasonable for her family.

The trustees accepted the trust conferred upon them by the will; but at the time when the note was given, they had not paid or advanced her any thing from the estate of her father, and had not authorised or empowered her to make any contracts, which should affect the property by them holden in trust; and neither of them in fact knew, that she was about to make any purchase of furniture, or execute any note; but the plaintiff claimed, that such knowledge might be inferred from the other facts herein found.

The plaintiff, when he received the note, had been informed, that she was entitled to a large estate, by virtue of the will of her father, to her separate use, but did not know who were the trustees, or whether there were any. When he ascertained that *Oliver Beirne* was one, which was a considerable time after his note became due, he presented the note to him, informing him for what purpose it was given, and requested payment. *O. Beirne* did not object to the purchase, nor to the payment of the note, but declined payment for want of funds, then in his hands. The other trustee had no knowledge of the purchase or of the note, until the commencement of the suit.

In *November,* 1845, the trustees, at the request of Mrs.

*Steenbergen*, purchased a lot of land in *Fairfield*, *Connecticut*, for 4,000 dollars, and took the conveyance to themselves, and subsequently, from time to time, advanced to her, or paid upon her orders, large sums of money, amounting to 14,000 dollars, with which she and her husband have erected an expensive dwelling-house and other buildings upon said lot, for the purpose of providing a house for her and her family. After the erection of the house in *Fairfield*, *Steenbergen* removed, with his wife, family and furniture, from *Southport* into the house where they have ever since remained. (*a*)

The questions arising upon these facts, as to the remedy of the plaintiff, if any, were reserved for the advice of this court.

*Hawley* and *Osborne*, for the plaintiff, contended, 1. That the contract for the purchase of the furniture, was made with the consent of the trustees. In the first place, the purchase of the furniture was a necessary part of the arrangement made by them for establishing Mrs. *S.* at housekeeping. On the 6th of *November*, 1845, they purchased the *Fairfield* property, for the express purpose of providing a *home* for Mrs. *S.* and her family. They of course intended that the house should be furnished. They must also have intended that the furniture should come from the trust fund; for her husband was then a bankrupt. The furniture was purchased in *March*, 1846, when it was needed for this purpose. Secondly, the trustees shewed, by their acts, that they meant to leave, and did leave, the building, improvements and fitting up of the establishment to Mrs. *S.* They purchased the land, and remitted money, but gave no directions. Thirdly, they acquiesced in the purchase of the furniture, by permitting it to be put into the house and used, after notice. Fourthly, the remittance, by the trustees, to Mrs. *S.*, of moneys to be expended, at her discretion, amounts to a *ratification* of the purchase. It authorised her to apply the moneys to *past*, as well as to *future* purchases, and is decisive evidence that the trustees left the fitting up

(*a*) For some particulars, not embraced in this general statement, see the opinion of the court in this case, *post*.

of the establishment to her. Fifthly, there was an *express* assent, by *Oliver Beirne,* the acting trustee, when called upon, by the plaintiff, for payment. By declining to pay *then,* for want of funds, he impliedly promised to pay, when in funds. Sixthly, the purchase being within the general purpose of the will, and of the trust, and being *beneficial* to the *cestui que trust,* and her estate, assent will be presumed, in the absence of express dissent. If the trustees *ought* to have assented, the court, by virtue of its equity power, will consider such assent as given.

2. That Mrs. *S.* had authority to purchase the furniture on the credit of the trust fund, *independently of the consent of the trustees.* The established doctrine is, that a feme covert may dispose of her separate estate, unless she is specially restrained by the instrument creating it. It is an incident of the property. 2 *Sw. Dig.* 124   *Jaques* v. *Methodist Episcopal Church,* 17 *Johns. Rep.* 548. 2 *Kent's Com.* 163. (6th ed.)   *Owen.* v. *Dickinson,* 1 *Craig & Phil.* 48. *West* v. *West's* exrs. 3 *Rand.* 373.   *Vizonneau* v. *Pegraw,* 2 *Leigh,* 183. A restraint on alienation will not be implied : it must be created in express terms. *Jaques* v. *Meth. Epis. Church,* ubi sup.   *Acton* v. *White,* 1 *Sim. & Stu.* 429. In this case, Mrs. *S.* had a *vested* equitable title to the property. *Green* v. *Spicer,* 1 *Russ. & Mylne,* 390. At any rate, she had authority to charge the trust fund, to the extent of a suitable maintenance for herself and children.

3. That the court has a discretion to adapt the decree to the circumstances of the case, so as to do justice to all parties. 2 *Kent's Com.* 163. 2 *Sw. Dig.* 254. It may either, 1. decree that the trustees pay out of the trust property in their hands, and enforce obedience according to the course of chancery proceedings ; or 2. may decree the sale of any property within its jurisdiction, and apply the avails.

*Dutton* and *Ferris,* for the defendants, admitting that if the estate had been given to Mrs. *S.,* without limitation or restriction, the note in question might have been collected out of the estate, contended, That under the will of *Andrew Beirne* and the circumstances of this case, the plaintiff was not entitled to the relief sought. They insisted, 1. That Mrs. *S.,* by her father's will, had no *distinct* and *separate*

property whatever.   The property is given "for the exclu-
sive *use* of her and her children."   The trustees are vested
with full authority to apply the property "as to them shall
seem best, for their exclusive benefit."   It is uncertain how
many children she may have.   She, individually, has no ex-
clusive right in any portion of the property.   It was given
for the support of the *family,* as a family—not as individuals.
The intention of the testator is the governing principle.   The
wife is a feme sole no farther than the instrument makes her
so.   2 *Spence,* 512. 521.   *Clancy,* 294.   *Pybus* v. *Smith,* 1
*Ves. jun.* 189, 194.   *Scott* v. *Davis,* 4 *Mylne & Craig,* 89.

2. That Mrs. *S.* had only a *life interest.*   She had, there-
fore, no power to dispose of anything more than a share of
the *income* of the property, if she could dispose of that.
The case does not shew that there was any income, in the
hands of the trustees, which had not been delivered to her,
by them, before they had any knowledge of the existence of
the note to the plaintiff.   It is well settled, that a *cestui que
trust,* who has only a life estate, cannot affect the property
in trust.

3. That it was not the intention of the testator, that Mrs.
S. should have any controul over the property.   The *trus-
tees* are to apply the property "as *to them* shall seem best."

4. That *Oliver Beirne* never assented that the property
in his hands should be charged with the payment of this
note.   He never paid any claim, nor agreed to pay any.
The utmost that he did, was, to put money into her hands to
pay certain debts which she had contracted.   This would
give assent to those debts, and to no other.   An assent by a
guardian, or overseer, to one debt, raises no presumption in
favour of another.

5. That the application, by the trustees, of the trust fund,
to pay this note, would have been a *violation* of the trust.
An assent to such an act cannot, therefore, be *presumed.*
It can be established only by positive proof.   *Oliver Beirne's*
declining to pay the note, for want of funds in his hands,
raises no promise to pay it under different circumstances.
The assent, to be of any avail, must be that the property
should be charged.

6. That there is not the slightest evidence, that *George P.
Beirne,* the other trustee, ever *knew* of the note until this

*Fairfield
August, 1850*

Leavitt
*v.*
Beirne.

*Fairfield,*
August, 1850.

Leavitt
*v.*
Beirne.

suit was brought. One trustee could not dispose of the property without the assent of the other. *Lewin on Trusts,* 265. *Alexander* v. *Alexander,* 2 *Ves.* 643.

7. That the assent of the trustees, if shewn, would confer no power on Mrs. *S.* to charge the property. That power must be derived from the *will,* and from that alone. The trustees could not charge the fund, even by making themselves liable. 2 *Spence,* 514. & seq.

8. That the plaintiff has no equity. He took the note, relying on Mrs. *S.,* not on the trust fund, for payment.

WAITE, J.   The plaintiff's suit is founded upon the claim, that Mrs. *Steenbergen,* under the will of her father, took such an interest in the property given to her brothers, in trust for her and her children, that she has power to bind the same, by her contracts. If this claim can be sustained, then undoubtedly the plaintiff is entitled to the relief he seeks. For we freely admit, that property may be so given in trust, for a married woman, that she may use and controul it, as a feme sole may her own property, and may bind it by her contracts. And if her trustees refuse a compliance with her directions, in relation to the disposition of the trust property, their obedience may be enforced, by a court of chancery. *Donalds* v. *Plumb,* 8 *Conn. R.* 447. *Imlay* v. *Huntington,* 20 *Conn. R.* 147.

But, at the same time, we think it in the power of a parent to place property in the hands of trustees for the benefit of a son and his wife and children, with full power in them to manage and apply it at their discretion, without any power whatever in the son to interfere in that management, or in the disposition of it, until it has been actually paid over to him, by the trustees. In such case, a court of chancery will never interfere with the exercise of that discretion, until it is shewn, that there has been some abuse of the authority given to the trustees.

In many cases, the exercise of such power may be highly beneficial and necessary. A man may have a son, so fallen into vicious habits, as to be utterly unfit for the management of any property. A gift to him might be worse than useless. That son may have a wife and children, whom he entirely neglects. The father be both able and willing to make

*Fairfield*,
August, 1850.

Leavitt
*v.*
Beirne.

ample provision for them, and save them from being a public burden. But he can do nothing through the instrumentality of his son. But may he not through the intervention of trustees, in whom he can confide, and place property in their hands for the benefit of his son and family, beyond his controul ?

Again, a man may have a daughter married to a man, entirely reckless in the management of property. Whatever funds are placed within his reach will soon be scattered and gone, and do her little or no good. She may be so completely under his influence, that she would not dare to set up any will of her own, in opposition to his ; and any gift to her would, in effect, be one to him, and, practically, of no use to her, or her children. The father may be perfectly satisfied that any amount of property whatever can be of no benefit to them, unless placed entirely beyond the controul of both. But his object may be accomplished through the medium of trustees, clothed with the custody and the entire disposition of the property, for the benefit of his daughter and her children. It may be unpleasant to them to be deprived of the privilege of spending the property, so given, as they please ; but, at the same time, the father had the power of disposing of his property as he thought proper, and they must be content to take it in the manner he has prescribed, or not at all.

It is true, this power may, sometimes, be unnecessarily and capriciously exercised, but is not more likely to be abused than many others, appertaining to the ownership of property. There is much more danger to be apprehended from the power which a father has, of cutting a daughter off from any portion of his estate, or of giving her a mere nominal legacy, than there is, that he will give her the beneficial use of a large share of his estate, and at the same time, unnecessarily deprive her of the controul and disposition of the property. In the latter case, he will be likely to select for trustees, men, to whom her rights may be safely confided. But however this may be, the power, in both respects, exists, and cannot well be controuled, without placing undue restraints upon the alienation of property.

The enquiry, then, in the present case, comes to this ; was the property given by the testator to his two sons in

trust, for the benefit of his daughter and her children, so given as to be subject to her controul, and liable to be bound by her contracts ; or were the trustees clothed not only with the custody of the property, but the application of it, according to their discretion, for the purpose specified.

If the former is the fair construction of the will, then the trustees are bound to apply it according to her directions, in the fulfillment of her contracts. If the latter is the true construction, then they are neither to be governed by her orders, nor by any interference of a court of chancery with the exercise of their discretion, until it is shown, that there has been some abuse of their authority.

What are the provisions of the will, in this case ? The testator, after giving several legacies, directs the balance of his property to be divided equally among his children, subject *to the following provisions and conditions.* Those relating to his daughter's share are briefly these. All the property given to her *is for the exclusive use of her and her children,* free from any debts *or controul* of her husband ; and to secure the same to their *unimpaired* enjoyment, he gives the same in trust to his sons, *George P. Beirne* and *Oliver Beirne, with full authority to apply the property as to them shall seem best,* for their exclusive benefit, during the life of the daughter, and after her death, to divide the same equally among her children.

Now, in the opinion of a majority of this court, the trustees, by the terms of the will, are clothed not only with the legal title to the property, but the power to apply it, *as to them shall seem best,* or in other words, according to their discretion. They must indeed apply it for the benefit of the daughter and her children ; and were they to appropriate it to any other use, a court of chancery might then interfere, because they would then transcend their authority. But so long as they continue to use the funds for the benefit of their sister and her children, it is for them to apply them according to their judgment. Suppose she should be of opinion, that a particular mode of investment would be best for her and her family ; and the trustees should be of an entirely different opinion, and therefore refuse a compliance with her request. Whose judgment is to govern ?—hers or theirs ?

*Fairfield,*
August, 1850.
————
Leavitt
*v.*
Beirne.

This question is to be determined, not by enquiring whose judgment is the best,—but which has the power of deciding.

It seems to us, that the language of the will leaves no possible doubt upon the subject. They have full authority to apply the property, as *to them* shall seem best, and not as may seem best to *her*. Suppose the trustees had carefully examined the facts in relation to the purchase of the furniture, and had come to the conclusion, perfectly satisfactory to their minds, that such purchase *was not best* for their sister and her children, and therefore should refuse their approbation of the purchase, can a court of equity review their decision, and reverse it, if they find it to be wrong? We think the court has no such power.

But it is asked, may she not employ a physician, in a case of sickness in her family, or purchase a necessary article of clothing for her children, without the previous assent of the trustees? How far their refusal, or even neglect to furnish her with the means of providing necessaries for herself and children, would constitute a breach of trust in them, we need not enquire; for no such case is presented for our consideration. It does not appear, that they have ever refused to comply with a single wish of hers, unless it be in their refusal to pay the note in question. And even with respect to that, it does not appear, that she ever made a request to them that they should pay it. Her husband, through his influence, obtained the note from her, upon an agreement on her part, that it should be paid out of the trust property, but without the knowledge of the trustees; and they now refuse to pay it; which is about all there is in the case. Aside from this, it is found, that large and ample funds have been placed subject to her controul.

Whether it was wise or proper for the testator to deprive his daughter of all controul over her share of his estate, and place it in the hands of his sons, to be applied at their discretion, is not for us to say. The only question for us to determine, is, whether he *has* done so; and we think he has. Nor has he thought proper to assign his reasons, for so doing. Nor was that necessary. We think, however, we need not travel out of the record to enable us to discover enough to induce the belief that he might consider it more safe and beneficial to his daughter and her children, to place the prop-

*Fairfield,*
August, 1850.

Leavitt
*v.*
Beirne.

erty beyond the indirect, as well as direct, controul of his son-in-law. His sons might resist his influence, when the daughter might not.

It appears, that about a year before the death of the testator, *Steenbergen* purchased a large and expensive dwelling-house in the city of *New-York,*—furnished it with costly furniture, lived in it but a few months, failed in business, sold the house and furniture, and then went with his family to board at a hotel. Soon after the death of the testator, he applied to the agent of the plaintiff to redeem the house and furniture, with a view of resuming house-keeping. An arrangement is made, by which his wife, at his suggestion, and by his advice, is induced, without the knowledge or approbation of her trustees, to execute a note to the plaintiff for 3,587 dollars, 70 cents, for the furniture, thereby reducing the price to be paid for the house to 12,000 dollars, and instead of occupying the house with his family, it is immediately sold and conveyed to another person. The note is payable in about five months after its execution ; and it does not appear, that *Oliver Beirne,* one of the trustees, who lived in the city of *New-York*, where the whole arrangement was made, had any knowledge of the transaction until a considerable time after the note became due, and was presented to him for payment. The other trustee had no knowledge whatever upon the subject, until process in this suit was served upon him.

Under these circumstances, what was the duty of the trustees ? It is found, that they had, previous to their knowledge of this transaction, made large advancements to their sister, which she had expended at her pleasure. If they paid the note, it might be construed into an implied recognition of her power, by her contracts, to bind the trust property, and induce the husband, by like suggestions and advice, to procure the execution of other notes, to aid him in carrying on other financial operations. They may have thought, and justly too, that the most effectual mode of preserving the property for the unimpaired enjoyment of their sister and her family, was to shut, at once and forever, the door against all debts contracted by him, directly, or in the name of his wife. We cannot, therefore, say, that under such circumstances, the trustees, in refusing payment of

the note, have been guilty of any breach of the trust reposed in them. At any rate, we think it a matter confided entirely to their discretion, and for them to do, in the language of the will, *as to them seemed best*.

*Fairfield*, August, 1850.

Leavitt
*v.*
Beirne.

Again, it is asked, shall Mrs. *Steenbergen* be permitted to retain the property, and not pay for it? But that is not the question before us. It is simply, whether the trustees shall be ordered to pay for it out of the trust property. And why should they be so ordered? They have never purchased it, directly or indirectly. No conveyance has ever been made to them; they have never received it, and have no controul over it. The plaintiff, instead of dealing with them, has thought proper to deal alone with *Steenbergen* and his wife, and place them in possession of the furniture. What his rights are, as against them, or in regard to the furniture, is not for us to determine, in the present suit.

A part of the furniture, very soon after the purchase, was sold; and what became of the purchase money, we are not informed. Had the trustees received the property, or had any conveyance been made to them, by which they could controul it, the case would be very different. But no such facts appear.

Again, it is said, that the trustees have a large amount of funds in their hands, and have made large advancements to their sister, and why should they not pay this debt? The amount of the trust estate can have no effect upon the construction of the will, as it makes no reference to the amount. The power of the trustees must remain the same, whether the funds in their hands are an hundred thousand, or only an hundred dollars. And as to the advancements, it was a matter confided to their discretion, and does not, in our opinion, affect the question as to their liability in the present case.

There is another feature in the case, which possibly may be deserving of some attention. The property is not given for the sole use of Mrs. *Steenbergen*, but for the use of herself and six daughters. If she can bind it, by a contract for the purchase of furniture, why may not each of her daughters do the same, when she becomes of age and is married? And if for furniture, why not for other articles which she may deem suitable for her rank and condition in life? The

*Fairfield,*
August, 1850.
———————
Leavitt
*v.*
Beirne.

effects of such power in so many different individuals, acting separately and independently, to say the least, would be very troublesome and embarrassing to the trustees. But no such jarring of interests would arise upon the other construction of the will.

For these reasons, a majority of the court are of opinion, that as against the trustees, the plaintiff is not entitled to the relief prayed for in his bill, and advise the superior court to dismiss the same.

Storrs and Hinman, Js., were of the same opinion.

Ellsworth, J. I cannot concur in the opinion of my learned brethren, just delivered.

It is manifestly unjust, that Mrs. *Steenbergen* should be left to enjoy the furniture in question, while she refuses to pay for it out of the ample fund fairly pledged for payment, especially, as the fund is itself increased just so much, and since there is no possible way but this, of obtaining payment at all. If this bill is dismissed, the debt is, of course, entirely worthless.

Col. *Beirne* died worth more than half a million of dollars. After giving some small legacies, he declares in his will, that the balance of his estate shall be divided *equally among his children.* This gives Mrs. *Steenbergen* more than 83,000 dollars. At the death of her father, in *March,* 1844, she, with her daughters, some of them fully grown, was living at board, in the city of *New-York.* Until a short time before her father's death, she had lived in an expensive and well-furnished house in *Barclay* street, in a style of life corresponding with her rank and her expectations from Col. *Beirne's* ample possessions. She seems to have possessed the affections and confidence of her father, in the fullest measure. He gave her an *equal* share of his estate, and, carefully provided, that his daughter and her children should have the fullest enjoyment of it possible. The language of the will is " I give my *property* to be equally divided among my children"—" the *property* given to my daughter *Mary D. Steenbergen,* is for the exclusive use of her and her children, for their *unimpaired* enjoyment."

This is a devise of *property*—of property too, for an " unimpaired," or absolute enjoyment. It is not an uncertain,

indefinite *license* to Mrs. *Steenbergen*, to call on her trustees to dole out, from time to time, so much of her share as should be satisfactory to them.   They hold the fund for her enjoyment—for her *full* enjoyment—in exact subservience to her wants, not their pleasure—not as distributers of their own bounty, but of the testator's bounty.

No question is made, by the counsel for the defendants, but that by the law of *New-York*, in a court of equity, a feme covert is possessed of the power of a feme sole in the use and disposition of her separate property.   So the law is laid down, in *Jacques* v. *Methodist Episc. Church*, 17 *Johns. R.* 548.   Such is the law of *England*, as may be seen by the array of cases in *Clancy* and 2 *Sto. Eq.* 36.—and such is our law.` *Imlay* v. *Huntington* & al. 20 *Conn. R.* 146—178.

Nor is the case embarrassed with the question, sometimes raised, what shall be taken to be an appropriation of separate property, by a feme covert.   The antient cases in *England* held, uniformly, that contracting a general debt was an appropriation, or else such an engagement amounted to nothing ; for as the woman was a feme covert, she would not be personally liable ; and if her separate property could not be reached, she would not be liable at all.   Such, I rather think, is the law, at the present time, though it has sometimes been called in question.   But in this case, there is no such question ; for at the time of the purchase, and indeed as a part of it, her property was pledged for this debt, and it was mutually agreed, that the debt should be paid out of it ; and nothing more than this is required in any case which has fallen under my observation.

Let us look at the circumstances which attended the purchase of this furniture.

At the death of Col. *Beirne*, Mrs. *Steenbergen* was living, at the *Clinton Hotel* in *New-York*, with her daughters. Learning of the ample provision made for her, in her father's will, she re-purchased the furniture, which she had, shortly before, given up, to satisfy her husband's debts, in order that she might again resume house-keeping, which she did, in her former residence.   She received back the furniture, worth more than 6,000 dollars, for the note in question of 3,589 dollars, 70 cents, upon an agreement with Mr. *Leavitt*, that,

*Fairfield,*
August, 1850.
_____
Leavitt
*v.*
Beirne.

when due, it should be paid out of her estate. From that time, she has continued, uninterruptedly, to enjoy her purchase, except that she has sold the furniture of two rooms, and used the money received from it, for herself, thereby relieving her own funds to that extent. *Oliver Beirne,* one of the trustees, was, all this time, living in *New-York,* and had not made any payment to her, whereby to purchase furniture, or any thing else. He did *then,* as he has continued to do since, leave the management of her family affairs to her *own* judgment.

It is further found, that the furniture in question was neither " *extravagant* nor *unreasonable.*"

Why now shall not this debt be a lien on Mrs. *Steenbergen's* share of the estate, *or the income from it,* and on the furniture itself? The objection urged, is, that the trustees did not give their consent to its purchase; and that without their consent, no debt can be contracted, which will incumber the property or the income from it. The answer is two-fold. Their assent to *this* purchase was not indispensable; and if it was, they may be held to have given it.

First, was their assent indispensable? It is certain the *cestui que trusts* are ever to have an " unimpaired," exclusive enjoyment of this portion of the estate. Can they, then, enter into no contracts whatever—not even for conveniences or necessaries, without first obtaining consent? Can they employ no mechanic, instructor, physician, servant or labourer until leave obtained? Are both of the trustees, (for one is not enough,) first to be hunted up, by Mrs. *Steenbergen,* and made acquainted with all her wants and purposes? And when she has found them, and respectfully supplicated their consent, what if they refuse to give it? What is her situation then? Now, I must think this is a dependence—I had almost said, a degradation—little anticipated by Col. *Beirne*—a restriction contrary to the manifest object of his bounty, and quite incompatible with the comfort and respectability of this family. Should they object to the purchase of articles of convenience and necessity, would not equity instantly afford relief? And if so, why will it not now? *This* purchase is found to be of that character; and all parties are now before the court, that justice may be done.

Is it said, Mrs. *Steenbergen* may perhaps enter into con- *Fairfield,*<br>August, 1850. tracts to procure necessaries, without getting previous con- sent from the trustees, but can go no further than this. Leavitt<br>*v.*<br>Beirne. Well, she has not gone farther than this, in the purchase under consideration ; and this is all I have occasion or de- sire to maintain, in order that this creditor should be entitled to payment. The power of the trustees to interpose, in certain cases, to protect or distribute this fund for the bene- fit of the family, is a different thing altogether. This is not that case, but quite otherwise. If indeed, the trustees are interposing here, for the benefit of the family, their sense of propriety and honesty is not the most correct, in my judg- ment ; and if Mrs. *Steenbergen* approves of the course pur- sued, she is willing to enjoy other people's property, without paying for it.

There is a case in our own court, *Donalds* v. *Plumb*, 8 *Conn. R.* 448. which illustrates and supports these equitable views. *Rufus Marsh* made his will, giving the use and improvement of his estate for the support of his daughter *Abigail Kingsbury*, during her life. She became sick, and employed Dr. *Plumb* as her physician. Not being able to get his pay, he brought a bill in equity to reach her equitable estate, and he succeeded. *Williams*, **J.**, in giving the opin- ion of the court, says, "when property is given, as it often is, for the sole and separate use of a feme covert, and she contracts debts for her support, the fund can be resorted to, by a creditor, who has furnished her with necessaries."

* * * * "But surely, Mrs. *Kingsbury*, upon the credit of a fund given to support herself and her children, will, in a court of equity, be considered as authorised to procure, by means of it, sufficient assistance to prevent them from suf- fering for want of food and medical aid."

Further, if it be important, the trustees and Mrs. *Steen- bergen* have, uniformly, put the same construction I contend for on this devise, *viz.* that she was to conduct, at least her domestic affairs, without their supervisory controul.

*Oliver Beirne* lived in *New-York*, and knew that his sister must have occasion to purchase furniture for the family. What did he do towards it ? Did he advance money to aid her ? Did he object to her buying it *on credit ?* Or to her doing whatever might be needful, according to her own pleasure ?

*Fairfield,*
August, 1850.

Leavitt
*v.*
Beirne.

Obviously, he left the whole matter to his sister's taste and decision. Pray, how did he suppose the furniture would be, or had been, procured, except just as it was procured ? He had then advanced her nothing. So too, he never objected or intimated, that he dissented from her purchase. Did he, at any time, after he knew his sister had incurred this debt, repudiate it, or inform Mr. *Leavitt* of her inability to contract, or of his dissatisfaction with her conduct ? Never— but, on the contrary, when called upon by the creditor, to meet this engagement of his *cestui que trust,* he only said, he had not *then* the money in hand, to pay the note. He knew all about what his sister had done ; and I do fully believe unequivocally acquiesced in her acts. Besides, these brothers not only left their sister to provide necessaries and conveniences for her family, but after the purchase in question was made, and really following it up, at her mere pleasure, they took a deed, in their names, for her, of a site for an expensive house in *Fairfield* in *Connecticut,* and then left her to *build,* and *finish,* and *furnish* the house, and fit the grounds about it, according to her pleasure. So they have conducted throughout, never consulted, and never expecting or wishing to be consulted. They meant their sister should have an " unimpaired enjoyment" of what was her own. And so of the moneys since paid her, they have never asked her a question or imposed any restrictions, but committed them to her pleasure alone. If now they propose to raise a question as to her power to act as she uniformly has done, and full in their view too, it would redound more to their credit to wait until they are presented with a case of *oppression,* or unfairness, and not begin with a transaction so honourable and upright as this is. They have quietly permitted the trust fund to be increased more than the debt in question, and now, while the *cestui que trust* is enjoying the furniture as if paid for, they resist payment, to save property *for* the family ! If equity cannot interpose, in such a case, then the doors of justice, which should ever be open to redress grievances, are opened in vain.

In this opinion CHURCH, Ch. J. concurred.

Bill dismissed.