Jourolmon v. Massengill.

2pi 81|
4pi 501|
4pi 782|

86    81
110   62
110   87|

## JOUROLMON v. MASSENGILL.

### (*Knoxville.*   October 26th, 1887.)

1. CHANCERY PLEADING AND PRACTICE. *Res adjudicata. Must be pleaded and proved.*

   In equity, *res adjudicata*, to bar a hearing on the merits, must be set up by proper averments, either in the bill or answer, or by separate plea, and must be proved.

   Case cited and approved: Turley v. Turley, 85 Tenn., 252.   (*Id.*, 77.)

2. SAME. *Same. How pleaded.*

   *Res adjudicata* is not sufficiently pleaded in equity, unless so much of the former proceedings are set out as will clearly show that the issues in the former and in the pending case are identical.

   Cited: Story on Equity Pleading, § 791.

3. SAME. *Same. Decree overruling demurrer. Dismissal.*

   A decree of this Court overruling a demurrer to a bill and remanding the cause, followed by a dismissal without further proceedings in the Chancery Court, will not bar a hearing upon the merits in a subsequent litigation between the same parties involving the same subject-matter and issues. Such decree *decides* only that the bill has on its face sufficient equity to require an answer.

   Case cited and approved: Battle v. Street, 85 Tenn., 282.

7

Jourolmon v. Massengill.

4. SUPREME COURT PRACTICE. *Record. Transcript in another case. Code,* (*M. & V.*), *§ 3890, construed.*

A record of this Court, introduced as evidence on the hearing of a cause in an inferior Court, must, on appeal of such cause, be copied into the transcript, or it will not, without consent of parties, be regarded on the hearing in this Court. Section 3890, (M. & V.) Code, has no application in such case.

Code cited: § 3890 (M. & V.); § 3171 (T. & S.).

5. WILL. . *Construction. Devise creating a valid, active trust for a person sui juris, and excluding his creditors.*

A testator devised his lands, subject to charges, to his son. By a codicil he provided that these lands should "be vested in A as trustee, for the use and benefit of my said son; and no part of the same is to be subject 'to execution, or other legal process, for any debt or liability he may have contracted, or may hereafter contract; nor is he to sell the same, nor any part thereof, but may use the rents and profits for his support and that of my wife; but he shall have the right to dispose of the same by last will and testament." Both the will and codicil were duly recorded.

*Held:* That this codicil created a *valid and legal active trust,* for the support of testator's son during life, out of the *rents and profits* of the land, which was not affected by the death of testator's widow, and was not within the reach of the son's creditors.

Case cited and overruled: Turley v. Massengill, 7 Lea, 353 (construing this will).

6. SAME. *Same. Testator's intention controls.*

In the construction of *wills* the testator's intention rules, and, when ascertained, will control the technical terms used; not so, however, as to *deeds.*

Case cited and approved: Smith v. Thompson, 2 Swan, 389.

7. TRUSTS AND TRUSTEE. *Trustee's title. Measure of its extent and duration.*

A trustee *takes* and *retains* that exact quantity of interest, and no more, in the trust property, both as to extent and duration, which is requisite for the. proper and efficient execution of the *powers* and *duties* conferred upon him, and to effectuate the purposes of the trust. ·

Cases cited and approved: Ellis v. Fisher, 3 Sneed, 223; Gardenhire v. Hinds, 1 Head, 409; Hooberry v. Harding, 3 Tenn. Ch., 677.

(See 9 Lea, 25; 85 Tenn., 646.)

Jourolmon *v.* Massengill.

8. SAME.  *Same.  Case in judgment.*

Under the provisions of the will in this case, the duty to protect the *corpus* of the estate from alienation, and both the *corpus* and income from subjection to the devisee's debts,·and to see the income properly applied to the support of the son and widow of testator during their lives, rested by *necessary implication* upon the trustee; and therefore it was essential that the *legal title* to the property should *vest* and remain in the trustee.

9. SAME.  *A devise for support of person sui juris, excluding his creditors and power of alienation, valid.*

An active trust, created by will duly recorded, for the support of testator's widow and son (both *sui juris*), is valid and legal, although its *chief purpose was to protect the property against the debts and contracts of the son.*

The creation of such trust is not contrary to sound public policy, violates no law of property, is approved by justice and humanity, and in this State has legislative sanction.

Code cited: §§ 5026–5029 (M. & V.); §§ 4283–4286 (T. & S.).

Cases cited and approved: Gardenhire *v.* Hinds, 1 Head, 409; Griffith *v.* Dewitt, Thompson's Cases, 188; Nichols *v.* Levy (Nashville, 1859); Branner *v.* Rankin (Knoxville, 1887); Hooberry *v.* Harding, 3 Tenn. Ch., 677; 5 Wall., 441; 1 Otto, 716; 4 Otto, 523; 133 Mass., 171; 10 Gratt., 336; 30 Vt., 338; 21 Conn., 1; 52 Cal., 326; 7 Watts, 547; 47 Penn. St., 113; 59 Penn. St., 393; 64 Penn. St., 207; 8 B. Mon., 56; 35 N. Y., 361; 9 Hare, 475; 3 Beav., 20.

Cited and overruled: Turley *v.* Massengill, 7 Lea, 353; Hooberry *v.* Harding, 10 Lea, 392.

10. CHANCERY JURISDICTION.  *To compel discovery.  Section 5026, (M. & V.) Code, construed.*

Code, § 5026 (M. & V.), must be construed as taking from the Chancery Courts all jurisdiction to compel discovery by a debtor of his property not leviable at law *in the cases therein excepted.*

Code cited: § 5026 (M. & V.); § 4283 (T. & S.).

Cases cited: 6 Yer., 186; Meigs, 364; 5 Cold., 633; 35 N. Y., 366.

Cases cited and overruled: Turley *v.* Massengill, 7 Lea, 353; Hooberry *v.* Harding, 10 Lea, 392.

11. STARE DECISIS.  *Applied in overruling recent decisions and restoring former ones.*

When a decision of recent date, by a divided Court, has been followed but once; has met the strong disapproval of the profession; has over-

Jourolmon *v.* Massengill.

ruled the construction of a statute which had prevailed and been a
rule of property for fifty years, upon the authority of the highest
courts, without noticing the former decisions; has unsettled the titles
to large masses of property based on that construction of the statute;
such decision will be overruled, especially if against the weight of
American authority and contrary to sound public policy.

Cases cited and approved: Barton's Lessee *v.* Shall, Peck, 239; Sherfy
*v.* Argenbright, 1 Heis., 128.

## FROM GRAINGER.

Appeal from Chancery Court of Grainger County.
C. J. St. John, Ch.

Henderson & Jourolmon and Lucky & Yoe for
Complainant.

J. T. & J. K. Shields for Respondents.

Lurton, J.  Complainant Jourolmon, claiming title
under a Sheriff's deed, brings this bill to recover
possession of certain lands described in said deed.
The property was sold as the property of defendant,
Massengill, to satisfy several judgments against him,
and was purchased at execution sale by Jourol-
mon, as trustee, for the several execution creditors.
The judgments, levies, and sale upon which the
Sheriff's deed depends are all regular, and complain-
ant will be entitled to a decree, provided the de-
fendant, Massengill, had such title as was subject
to levy and execution sale.  Whatever interest Mas-

sengill has in said property he took under the will of his father, Robert Massengill, who died in 1866. This will was duly admitted to probate, and the clauses bearing upon the title to the lands now in controversy are as follows:

"To my son, S. S. Massengill, I give all the remainder of my estate, both real and personal, charging him with the payment of all my just debts, and solemnly enjoining upon him to take care of and support his mother on the home farm, and to observe toward her in the future the same tenderness and affection which has so signally marked his conduct in the past. I also request of him that he will not sell the home tract of land, or any part thereof, but that he will keep it as a home for himself and those who are to come. after him. I make no provision for my beloved wife, except that she shall reside in the old family mansion with my son Sterling, feeling doubly confident that his kindness and generosity will amply supply all her wants."

On July 31st, 1864, the testator made a codicil in these words:

"My will is that all the property of every kind bequeathed to my son, S. S. Massengill, in the sixth clause of my will, be vested in Dr. John W. Thornburg, as trustee, for the use and benefit of my said son; and no part of the same is to be subject to execution or other legal process for any debt or liability he may have contracted, or may hereafter contract. Nor is he to sell the

same, nor any part thereof, but may use the rents and profits for his support and that of my wife, E. H. Massengill; but he shall have the right to dispose of the same by last will and testament."

Dr. Thornburg resigned as trustee some years since, and defendant, Branner, was appointed in his room and stead. The contention of complainants is, that the trust attempted to be created by the codicil to the will of Robert Massengill is void, and that an absolute legal title in fee-simple vested in S. S. Massengill.

In support of this proposition complainants contend that heretofore, in another litigation between W. H. Turley, one of complainants, and these same defendants, such a decree was pronounced by this Court as now constitutes an adjudication that the trusts of the will were void, and the lands subject to levy and sale; that W. H. Turley is one of the judgment creditors, whose execution was levied upon this land, and one of the creditors for whom the land was purchased by Jourolmon; and that, regardless of the validity of the sale made for other execution creditors, the title, by operation of the former adjudication, passed to complainant, Jourolmon, as a purchaser under the sale to satisfy the judgment of said Turley.

The plea of *res adjudicata*, in equity, must be distinctly set out either in the bill or answer, or by separate plea. Unless it is pleaded it cannot be relied upon in the proof. *Turley* v. *Turley*, 85 Tenn., 252.

When properly plead it must then be proven. The bill does allege that W. H. Turley did file his original bill as a judgment creditor against Massengill and Branner, seeking a construction of the will of Robert Massengill, and to subject the interest of said Massengill to satisfaction of said judgment. It charges that the defendant answered and demurred in the same pleading, and the demurrer, coming on to be heard, was overruled by the Chancellor; that an appeal to this Court was allowed from the decree overruling the demurrer, and that the decree of the Chancellor upon the demurrer was affirmed, the Supreme Court holding and decreeing "that the said Massengill took an estate under said will which was leviable by execution at law and subject to the payment of his debts, and said cause was remanded for further proceedings." The bill does not state what further proceedings were had after the cause was remanded, but from the bill it is inferrable that no decree was ever had upon the merits, for the complainants conclude their allegations upon the matter of the former decree by the statement that Turley, fearing that the description of the land he sought to subject to payment of his debt was too slight and indefinite to fix a superior lien upon it as against other creditors, sued out execution from the Circuit Court and had the land levied upon and sold at Sheriff's sale. It will be seen that the complainant does not set forth either the bill, demurrer, or decree so that it may be seen

that the same point was then in issue, but contents himself with stating what he deems the substance of the record. "Upon a plea of a former decree so much of the former bill and answer must be set forth as is necessary to show that the same point was then in issue." Story Eq. Pleadings, Section 791.

If, however, the pleader had filed the record upon which he relies as an exhibit to his bill, it would be a sufficint compliance. But there is no sort of conformity to this simple and manifestly reasonable rule of pleading, where a hearing upon the merits is sought to be avoided by a plea of former decree; and we are compelled to hold that the plea of *res adjudicata* is not well plead.

If these allegations are treated as sufficient to allow proof of a former decree, and reliance upon same as an adjudication, no such proof is made. The decree shows that upon the hearing the record in said cause of *Turley* v. *Massengill* was read, but the transcript contains only such part of said record as was made after the cause was remanded by this Court. Neither the bill, or demurrer, or answer are parts of the transcript. The Clerk, by this decree, was directed "to include in the transcript only such parts of the record in the case of *Turley* v. *Massengill* as were not included in the former transcript of said cause now in Supreme Court." There is no agreement that said former transcript may be treated as a part of the present transcript, and without such agreement we cannot

look to the other transcript. Section 3890 of the Code (M. & V.) only makes a transcript in this Court part of another when a cause comes again to this Court after being once remanded. This is not a second appeal in the case of *Turley* v. *Massengill*, and hence the transcript in that case cannot be looked to by us, or treated as a part of this record, same not being a part of the present transcript, and there being no agreement that it shall be so treated.

That part of the record of the cause of *Turley* v. *Massengill* properly made a part of the present transcript shows nothing relating to this question beyond a decree in these words:

"In this cause the complainant dismisses his bill. It is therefore decreed that complainant's bill be dismissed. But it appearing to the Court that complainant has obtained substantial relief under his bill, it is decreed that the defendants, S. S. Massengill and B. M. Branner, pay all the costs of this cause, for which an execution may issue."

This is the only decree either of the Chancery Court or Supreme Court before us, and just how the complainant had obtained substantial relief is not to be discovered.

If we look to the answer of Defendant Massengill to see if there are such admissions as make proof unnecessary, we find that while he admits the filing of a bill by said Turley, and that a demurrer was overruled by the Chancellor, and, upon appeal being taken from the decree overrul-

ing demurrer to the Supreme Court, the decree
was affirmed, and the cause remanded to the Chan-
cery Court for further proceedings, yet the answer
at the same time insists that the bill to which the
demurrer was filed did not state fully the facts,
and made many erroneous statements, nor does it
admit or undertake to state the character of the
demurrer.

The most that we can learn from the bill, an-
swer, and evidence is that there was a litigation
between one of complainants and these defendants,
which involved the title of S. S. Massengill under
the will of Robert Massengill to the land now in
controversy; that a demurrer was interposed by
the defendants, which was overruled by the Chan-
cellor, and upon special appeal from the decree
upon the demurrer that the Supreme Court affirmed
the decree overruling demurrer, and remanded the
cause for further proceedings; that Turley, instead
of proceeding with that litigation and obtaining a
final decree upon the merits, dismissed his bill and
proceeded upon his execution at law.

Ordinarily a decree of this Court overruling a
demurrer and remanding a cause to be proceeded
with is not an adjudication of anything more than
that there is sufficient equity upon the face of the
bill to require an answer. *Battle* v. *Street*, 85
Tenn., 282. Certainly no such decree is either
plead or proven as prevents us from determining
this cause upon its merits.

This brings us to the question as to whether

the interest of S. S. Massengill in this land was a legal or an equitable estate. If the former, then it was subject to execution; if the latter, then it was not. This question depends mainly upon the construction of the will of Robert Massengill heretofore quoted in the earlier part of this opinion. The contention of complainants is that no duty or control is imposed upon the trustee, and that it is therefore a dry trust; that, being a dry trust, the trustee would take no greater title than the necessities of the trust demand, and that from this premise the conclusion follows that no title whatever vested in him, but that the legal title passed to the beneficial owner. Let us examine this position and see whether the trust be a mere dry trust, or what is known as an active trust. The distinction between a technical dry trust and an active trust is sometimes not very obvious. The statute of uses—Henry VIII.—has never been held to apply to active trusts, and the courts of equity, both in this country and England, in order to carry out the intent of testators and settlors, have not been slow, where such intent of the creator of the trust was not in conflict with public policy, to sustain numbers of trusts which, upon slight inspection, might be deemed dry, and therefore executed by the statute. It has never been determined whether this statute was in force in this State, and this for the reason, probably, that, without regard to the statute, this Court has adopted the principle that a

trustee takes exactly that quantity of interest which the purposes of the trust require.

In the leading case of *Ellis* v. *Fisher*, 3 Sneed, 223, this Court said:

"Where real estate is devised to trustees and their heirs, to the use of or in trust for another and his heirs, the question whether or not the trustees take the legal estate depends chiefly whether the testator has imposed on the trustee any trust or duty, the performance of which requires that the estate shall be vested in them. If so, an estate co-extensive with the duties to be performed will vest in the trustees; if not, the legal ownership will pass over to the beneficial owner."

This rule is identical with the rule adopted by the courts of England, and of such States of this Union as have adopted the statute of uses to determine whether or not a trust is or is not a dry trust, and therefore executed by the statute, or an active trust and not within the purview of the statute. The statute of 29 Charles II., Chapter 3, Section 10, which subjected estates held in trust for the debtor to execution sale, has been held to be in force in this State. *Shute* v. *Hardee*, 1 Yer., 1. Though, without regard to this statute, the same result would probably have been reached where the trust was a dry or inactive one. In other words, if a trust be such an one as under the statute would become executed, and by operation of the statute vest the legal title in the ben-

eficial owner, then, without regard to either stat-
ute, by operation of this rule concerning the extent
of the title of the trustee, the same result would
be brought about. But if any trust or duty be
imposed upon the trustee, either expressly or by
*implication*, then the trust will not be a dry one.
Perry on Trusts, Sections 306 and 307; *Hooberry*
v. *Harding*, 10 Lea, 392.

To determine the extent of the title vested in
the trustee we must look to the intent, object, and
purpose of the testator. In trusts created by will
much more effect will be given to the intent of
the testator than where the trust is created by
deed. In the latter case an importance will al-
ways be attached to technical terms which they
will not be allowed to have in a will. On the
other hand, the intent of a testator rules the con-
struction of a will, and is stronger than the tech-
nical terms employed. *Smith* v. *Thompson*, 2 Swan,
389; Perry on Trusts, Sections 306, 307.

What was the intent of Robert Massengill in
making this devise to a trustee? The original
purpose, as shown by the sixth clause of his will,
quoted above, was to give this son a fee-simple
estate, charging upon him the payment of the
debts and the support of the widow of the tes-
tator. He also expressed a strong wish that the
home place—the land now in controversy—should
not be sold, but that it should "be kept for a
home for himself *and for those who should come
after him.*" He made no provison for his wife at

all, entrusting her support and care, in words amounting to a precatory trust, to this son.

This will was written in December, 1861, but in 1864 we find him concerned about the future support of his widow and son. This was doubtless aggravated by the condition of the country, and we find it manifested by the codicil executed that year—being the one now under consideration. He was no longer willing to intrust the care and support of his wife alone to the good will and good faith of the son. The gratification of his strong wish that the home place should not be sold, but kept as a home for his widow and his son, "and for those who should come after him," was no longer to depend upon the willingness of his son to satisfy this desire. The support of the son himself must not be intrusted to the uncertain results of the flagrant strife then raging and promising an indefinite continuance. To provide against his own possible misuse, as well as the misfortunes which wait upon all men, became an object of concern. The plans of the testator as to this son had undergone an entire change. The codicil plainly shows that his purpose was to provide for the support of his son and his own widow at all events and in all contingencies. To accomplish this he so alters his will by this codicil as to devise the legal estate for the life of his son to a trustee. He provides that the son "*may* use the rents and profits" for the support of himself and mother. The son is given power by last will to

designate the takers of the remainder estate, but
he should have no power to sell or use the cor-
pus of the estate. In default of an appointment
by last will, there being no other disposition made,
it is clear that upon the death of the son the
estate would descend to the heirs of the testator—
not the heirs of the son. Finally, as the trust
was for the *support* of the son, he declares that
neither the corpus of the estate nor the rents and
issues should be subject to the payment of the
debts then owing or thereafter created by the son.
That the interest of the son was to be limited to
a support, and that to be derived from the rents
and profits, without touching the corpus, is made
clear by the words, " Nor is he to sell the same,
or any part thereof, but *may use the rents and
profits for* his support and that of my wife." The
fact that the widow of the testator is now dead
only terminates her interest in the trust, and does
not at all affect the intent of the testator, which
was to provide for the support of both widow and
son, and rendered a trustee all the more essential.
The broad devise to the trustee, contained in first
part of codicil, " for the use and benefit of my
son," is qualified, and the character of use defined
by the subsequent facts. If the devise had stopped
there it could not be doubted but that it would
be a dry trust, and that the legal estate would not
have vested in the trustee, but would have passed
to the beneficial owner.

Now the purpose of the testator being to limit

the devise to the son to a support for life, *out of rents and profits*, such purpose could not be carried out without the interposition of a trustee. If the devise had been direct to the son, of the rents and profits for life, it would have vested in him the life estate.

"It is a cardinal principle of the law of real estate that a devise of the rents and profits, or the income of the land, is equivalent to a devise of the land itself. Such a devise is equivalent to a devise of the land for life, or in fee, according to the limitations in the will." *Davis* v. *Williams*, 85 Tenn., 651.

If he had devised the land in fee, and then limited the power of disposition to will, this would have been repugnant to the dignity of a fee, and the limitation would have been void. In any of the cases put, the estate would have been a legal estate, and subject to levy and sale at law. Manifestly, then, there was a necessity for a trustee if the purpose of the testator should be carried out, that the rents and profits should go alone to the support of his son, and that they should not be subject to alienation or liability to legal process. To prevent the use of the corpus of the estate, and to guard the rents and profits from any other use than the support of the son and widow, the interposition of a trustee was essential. • *We are not now discussing the validity of these purposes,* and of the limitations against liability for debts of the son. *This object may be legal or illegal, but whether*

*the one or the other, the clear purpose of the testator was that the trustee should take such a title as would prevent the* merging of the legal title with the equitable life estate; as would preserve the remainder estate for the appointees under the will of the beneficial owner for life; as would enable him to see that the rents and profits were applied to the support of the son and wife of the testator; as would prevent the alienation of any part of the corpus of the estate, and prevent the subjection of either the corpus or rents by creditors of the son. The duty to protect the corpus of the estate from alienation, or either the corpus or income from subjection by creditors of the devisee, and the duty to see that the income was applied to the support of the son and widow during the lives of either, by *necessary implication,* rested upon the trustee. These were active duties, and if not void, because illegal, make the trust an active and not a dry one.

"If any agency, duty, or power be imposed on the trustee—as by a limitation to the trustee and his heirs to pay the rents or convey the estate— or if any control is to be exercised or duty performed by the trustee in applying the rents to a person's maintenance, or in making repairs, or to preserve contingent remainders — in all these and other like cases the operation of the statute is excluded, and the trusts or uses remain mere equitable estates. So, if the trustee is to exercise any discretion in the management of the estate, in the

investment of the proceeds or the principal, or in the application of the income; or if the *purpose of the trust is to protect the estate for a given time, or until the death of some one, or until division,* or until a request for a conveyance is made." Perry on Trusts, Section 305.

"Although the direction may be for the trustee to permit and suffer another person to receive the rents, yet if any duty be imposed on the trustee, expressly or by implication, the legal title will remain in them unaffected by the 'statute." *Idem.,* 307.

The case of *Hooberry* v. *Harding,* 10 Lea, 392, is an instructive case upon this question of what is an active trust. The trust involved in that case was held to be an active one, and the interest of the beneficial owner an equitable one, and not subject to levy of execution, though liable in equity to the debts of the *cestui que trust,* because the Court thought a trust could not be created which would shield the interest of the beneficiary from liability for his debts. The Court, in that case, clearly held that, although the interest of the beneficiary could be subjected by a court of equity to the satisfaction of the debts of the beneficial owner, yet the trust was an active trust and the interest of the beneficiary an equitable and not a legal one, and therefore not subject to execution sale. The Court also held that when the trust was one which required some act to be done or duty performed, even if the act or duty was alone

for the benefit of the *cestui que trust,* yet such a trust would be an active one, and not within the statute of uses, nor executed in the beneficiary in this State, whether the statute of uses be in force or not.

But it is insisted that the trust in this case is one chiefly, if not altogether, for the purpose of protecting the estate of this beneficiary from his debts and contracts. If this be admitted, yet that does not prevent it from being a special or active trust. One of the very illustrations given by Mr. Perry, and upon which he cites a number of cases which we have had no opportunity to examine, of a special trust, is "where the purpose of the trust is to protect the estate for a given time or until the death of some one." Trusts for protection of the estates of married women during coverture against their husbands and his creditors, and the wife and her extravagance as well as her contracts, are made every day. Such trusts are sustained upon the ground that they are intended to "protect the estate" during coverture, and are hence held special and active. We have one case where the trust was "to suffer the said Margaret Hinds and her heirs forever to enjoy the possession and profits to her and *their own* sole and separate use and benefit forever." Margaret Hinds dying, leaving her husband and children surviving, it was insisted that the trust ceased upon discoverture. This Court, through Judge Wright, held that "it was just as necessary, and perhaps more so, to protect

this estate after the death of Margaret Hinds against the possession and wasteful habits of the husband as it was before." Again he said: "The heirs might be daughters, in which event the donor continues the separate estate, and for this purpose the trust is still necessary." *Gardenhire* v. *Hinds,* 1 Head, 409.

It is, however, insisted that while a trust to protect an estate of a married woman or infant or *non compos* might be good as a special trust, yet that a trust to protect the estate of a person *sui juris* is invalid, and that therefore this trust must fail, as the control or duty reposed in the trustee springs from ·the trust to protect the estate against alienation and creditors. This brings us to the question as to the legality of this trust to protect the estate from creditors of the beneficiary and against alienation. The trust would be valid by common consent if the object of the trust was the protection of the estate of a married woman or other person not *sui juris.* Will the fact ·that the object of the bounty of this donor is a person *sui juris* defeat what would otherwise be a valid special trust?

We have already seen that by the rule of the common law a man cannot attach to a grant or transfer of property otherwise absolute the condition that it shall not be alienated, such condition being repugnant to the nature of the estate granted. Lord Coke gives as the reason of the rule that it is absurd and repugnant to reason "that he that

hath no possibility to have the land revert to him should restrain his feoffee in fee-simple of all his power to alien," and that this is "against the height and purity of a fee-simple." By such a condition against alienation or liability to debt the grantor undertakes to deprive the property in the hands of the grantee of one of its legal incidents and attributes — namely, its alienability — which is deemed to be against public policy. But the reasons of the rule which apply with such force to fee-simple or other legal titles, do not apply in the case of the transfer of property in trust. By the creation of such a trust as the one now under consideration, the trust property passes to the trustee, with all its incidents and attributes unimpaired. He takes the legal title to the property with power of alienation, subject, of course, to the trust, and the beneficiary the whole legal title to the income at the moment it is paid over to him. The income is not therefore inalienable after it reaches the hands of the beneficiary. *Broadway Bank* v. *Adams*, 133 Mass., 171. The question as to whether the founder of a trust such as the one before us can secure the income of it to the object of his bounty by providing that it shall not be alienated by him or be subject to be taken by his creditors, is one of profound public interest. In two very recent cases decided by our predecessors they have held that such trusts were void because contrary to *public policy*. *Turley* v. *Massengill*, 7 Lea, 353; *Hooberry* v. *Harding*, 10 Lea, 392.

These decisions have excited such surprise and
disapproval with the profession that we are called
upon in this case to reconsider the ground upon
which they rest.   Judge Freeman, in the first case
referred to, places the invalidity of such trusts
upon the ground that "such restrictions and inhi-  •
bitions must be held as void, because repugnant to
the estate granted, and because contrary to the
letter and spirit of our statutes and laws, which
make all property of a party liable for his debts,
except such as is especially by those laws exempt
in favor of poor persons."   He quotes the *obiter*
of Justice Swayne in the case of *Nichols* v. *Levy*,
5 Wall., 441, a case wherein that Court sustained
the validity of just such a trust because it arose
in this State, and was by the statute laws of this
State, as construed by the Supreme Court of this
State, valid, and that such construction was bind-
ing in such case upon that Court.

As to the first ground of objection stated, that
the restriction is repugnant to the estate granted,
we have already seen that that applies to legal
estates, and does not, and in the nature of things
cannot, apply where the trust is to apply the in-
come to the support of the *cestui que trust*, or pay
the income into the hands of such beneficiary.   In
either case the income, when it comes to the ben-
eficiary, is his absolutely, and subject to alienation
when it has thus come to his hands.

This only brings us back to the question as to
whether there is any well-settled rule of public

policy which is contravened by the protection of
the income of such a trust from the creditors of
the beneficiary, and its application to the support
of the beneficiary. That the rule laid down by
Judge Freeman is supported by English authority
must be conceded. The courts of that country
have, in the interest of creditors, since the time
at least of Lord Eldon, held "that if property is
given, it must remain subject to the incidents of
property, and it could not be preserved from the
creditors unless given to some one else." *Brandon*
v. *Robinson,* 18 Vesey, 433. This English rule has
been adopted, upon the authority of the English
cases, by Mr. Story, and to a certain extent by Mr.
Perry. Story's Eq. Jurisprudence, Section 974*a;*
Perry on Trusts, Section 386.

But the latter text writer qualifies the doctrine
by the statement that certain distinctions, which
he proceeds to state, must be borne in mind, to
wit:

"But a trust may be so created that no inter-
est vests in the *cestúi que trust;* consequently, such
interest cannot be alienated, as when property is
given to trustees to be applied in their discretion
to the use of a third person, no interest goes to
the third person until the trustees have exercised
this discretion. *So,* if property is given to trus-
tees to be applied by them to the support of the
*cestui que trust* and his family, *or to be paid over
to the cestui que trust for the support of himself
and the education and maintenance of his children;*

*in short, if a trust is created for a specific purpose, and is so limited that it is not repugnant to the rule against perpetuities, and is in other respects legal, neither the trustees, nor the cestui que trust, nor his creditors or assignees, can divert the property from the appointed purposes.''* Perry on Trusts, Section 386*a*, citing *Rife* v. *Geyer*, 59 Penn. St., 393, and *Wells* v. *McCall*, 64 Penn. St., 207.

This statement of the doctrine which meets with his approval we shall see is in conflict with the English cases, but is supported by so large a number of the most reputable courts of this country as to constitute what may well be termed the American rule.

The statement of the English Courts that power of alienation and liability to creditors are necessary incidents of ownership of property is altogether too broad, and cannot be supported. When the legal estate is vested in the owner, considerations of public policy to prevent fraud and deceit, and to facilitate the transfer of title, would operate to make the rule generally true. But it is not always true in such cases. Our exemption laws and homestead laws all relate to property, the legal title to which may be vested in the owner, and yet under such laws large masses of property are, in pursuance of a public policy, finding expression in legislation, exempt from liability for debts, and in case of the homestead, not subject to alienation by the husband alone. Public policy might, with much reason, determine that the owner

of property could not impose on his own property, in his own hands, and for his own benefit, any restraint upon his own power of transfer, or the quality of non-liability to his own creditors. But where no act of the owner of the property imposes the burden or restricts the liability, but it was imposed by a vendor, testator, or donor, what rule of public policy is necessarily encountered in sustaining such restrictions, even when the legal estate is vested in the owner, all questions of notice out of the way?

Such a question was presented to the Supreme Court of the United States in the case of *Hyde* v. *Woods*, 4 Otto, 523. In that case that Court held that a Stock Board may make membership therein subject to the rule, that if the member becomes insolvent, his seat may be sold for the benefit of his creditors among the other members of the Board, and the payment of the proceeds of such sale to the members are not preferences void by the bankrupt law? The Court say: "It is said that it is against the policy of the bankrupt law; against public policy, to permit a man to make in this or any other manner a standing or perpetual appropriation of his property to the prejudice of his general creditors, and it is to this point that the numerous authorities of counsel are cited. They all, however, relate to cases where a man has done with his own property, on which he himself imposed the direction, or the incumbrance which impeded creditors. It is quite different

where a man takes property by purchase or otherwise, which is subject to that direction or disposition when he receives it. It is no act of his which imposes the burden. It was imposed by those who had a right to do it, and to make it an accompaniment of any title which they gave to it. The principle here contended for by counsel was well considered in the case of *Nichols* v. *Eaton*, 91 U. S., 716.

"In that case, the mother of the bankrupt Eaton had bequeathed to him by will the income of a fund, with a condition in the trust that on his bankruptcy or insolvency the legacy should cease and go to his wife or children, if he had any, and if not, it should lapse into the general estate, and be subject to other dispositions. The assignee of the bankrupt sued to recover the interest bequeathed to the bankrupt, on the ground that this condition was void as against public policy. But this Court, on full examination of the authorities, both in England and in this country, held that the objection was not well taken; that the owner of property might make such a condition in the transfer of that which was his own, and in so doing violated no creditors' rights, and no principle of public policy." 4 Otto, 523.

As anxious as have been the English courts in the interest of creditors to destroy such trusts, yet even the courts of that country have more than once sustained trusts conditioned to cease upon the bankruptcy or insolvency of the beneficiary. *Roch-*

*ford* v. *Hackman*, 9 Hare, 475; and see cases cited
and discussed in Lewis on Trusts, 80. And so
they have held. that a direction that a trust to the
first taker shall cease on his bankruptcy, and shall
then go to his wife or children, was good, and that
the entire interest passes to them; and they have
gone to the extent even of holding that when
there was a trust, the interest of which was to be
paid over to the beneficiary during his life, but to
cease upon bankruptcy, with power in such cases
in the trustee to pay over if he saw fit, but
wholly in his discretion, the sum the bankrupt
would have been entitled to but for such cessor,
for the support of the bankrupt, was a valid lim-
itation, and that the assignee could not recover
such income. *Pearcy* v. *Roberts*, 1 M. & K., 4;·
*Page* v. *Way*, 3 Beav., 20; *Twopenny* v. *Peyton*, 10
Lim., 487; and *Godden* v. *Crowhurd*, 10 Lim., 487.
These English cases are reviewed in an instructive
manner by Judge Miller in *Nichols* v. *Eaton*, 1 Otto,
716. This Court has seemingly already gone fur-
ther than the English courts; for it seems clearly
the opinion of Judge Wright that a trust for the
support of *husband* and *wife*, created by the wife
out of her property before marriage, and not to
be liable for the debts and contracts of the hus-
band, was valid, and the husband had no - interest
which could be reached by his creditors. *Griffith*
v. *De Witt*, Thompson's Tennessee Cases, 188. This
was clearly held by us at a former day of this
term in the case of *Rankin* v. *Branner*, opinion by

Judge Snodgrass. We are not able to see that the creation of such a trust, whereby a testator gives to the object of his bounty such a limited and qualified interest in the income of a trust fund as may enable him to provide against the improvidence or misfortune of the beneficiary, violates any principles of sound public policy.

It is suggested that such trusts contravene public policy, because, should all devises and gifts be surrounded by such limitations as to their use and alienability, it would in time result in limiting the use of vast masses of property, to the general injury of commerce. This argument is bottomed upon an extreme and highly improbable state of facts. It would apply with equal force to the English rule; for by indirection that rule reaches the same result—non-liability to creditors and non-alienability by means of a provision for a forfeiture upon insolvency or attachment, and a limitation over to the wife and children of the bankrupt, or that the income shall go to the augmentation of the principal in the hands of the trustee, with power in the trustee, in his *discretion,* to pay to the use of the bankrupt what he was entitled to before forfeiture. Again, all such trusts must be limited in point of duration by the rule against perpetuities; and their number would naturally be limited by the undoubted preference of testators not to embarrass the free use of their bequests by restraining limitations, except when there was some strong reason for such restriction. For fully fifty

years the law of this State was understood to permit such trusts, and yet their number is comparatively few.   No such reason has been advanced by any court; and if such a state of affairs existed as has been suggested, the remedy by legislation would be plain.

It does not in any way affect the creditors of the founder of the trust, as the restrictions apply only to the creditors of the donee, and of course the creditors of the donor affected by such gift could reach it upon grounds wholly independent of the limitations under consideration.

The creditors of the donee cannot be defrauded, because the property was never subject to their demands while owned by the testator.   There is no just reason why that which was never their debtor's, and never liable to their demands, should, merely for their satisfaction, be held liable to their claims.   The argument that to invest a man with apparent wealth tends to mislead creditors, and to induce them to give credit, is not tenable.   Creditors have no right to rely upon property thus held, and to give him credit upon the basis of an estate which, by the very terms of the instrument creating it, is declared inalienable and not liable for his debts.   To do so would be the grossest folly.   By the exercise of any sort of diligence they can ascertain the nature and extent of his estate, for the policy of our registration laws would require registration of a deed creating such trust, and if it arose under a will it would necessarily

be a matter of record. This objection is well met by the Supreme Court of Massachusetts in *Broadway Bank* v. *Adams*, 133 Mass., 174, who say :

"There is the same danger of their being misled by false appearances, and induced to give credit to the equitable life tenant when the will or deed of trust provides for a cessor or limitation over in case of an attempted alienation, or of bankruptcy or attachment; and the argument would lead to the conclusion that the English rule is equally in violation of public policy. We do not see why the founder of a trust may not directly provide that his property shall go to his beneficiary with the restriction that it shall not be alienable by anticipation, and that his creditors shall not have the right to attach it in advance, instead of indirectly reaching the same result by a provision for a cessor or a limitation over, or by giving his trustees a discretion as to paying it."

This same argument that a creditor might be misled would prove destructive to our homestead and exemption laws. Indeed, it would in some sense apply wherever a debtor is in possession or use of property he does not own, as a lessee or bailee. On the other hand, there seems to us the strongest reasons why such restrictions may be thrown around the bounty of a testator. Considerations of humanity, of love and affection, frequently demand that the objects of our care and affection shall be provided for in such manner as

that the bounty may be guarded against their improvidences as well as the misfortunes incident to life. To say that a father may not provide for the support of an unfortunate son by providing that the income shall be paid over to his support, and that it shall not. be subject to assignment or the coercion of creditors, is to say in many cases that human law is so defective that the most sacred instincts of regard and affection cannot be gratified if that son happens to be indebted or to be the victim of evil or unfortunate habits or extravagance. We know of no rule of public policy which demands that the property of such a donor shall be subject to the debts of the beneficiary, and the creditor has no right to complain that ":the owner of the property, in the exercise of his right. of absolute disposition, has not seen fit to give the property to the : creditor, but has left it out of his reach."

But let us look at the question as one of authority, and see to what extent the English rule has been adopted in this country. We have already quoted Mr. Perry on this subject. Professor Pomeroy, while touching upon the question very slightly, yet clearly, shows that in his opinion such trusts are valid. 2 Pom. Eq., Sections 982 and 1004, and especially note 4 to the latter section. He cites a California case as sustaining such a trust. *Kennedy* v. *Mason*, 52 Cal., 326. The most notable case, both by reason of the high character of the tribunal and the ability and fullness of the

argument, is that of *Nichols* v. *Eaton,* 1 Otto, 716.
The trust under consideration in that case was one
created by will, whereby the income, rents, profits, div-
idends, and interest arising from testatrix's estate were
bequeathed to trustees for her children during life,
with a restriction or limitation that if any of the
beneficiaries "should alienate or dispose of the in-
come to which they were entitled under the trusts
of the will, or if by reason of bankruptcy, or in-
solvency, or any other means whatsoever, said in-
come could no longer be personally enjoyed," then
it was provided that the trust in behalf of such
beneficiary should cease, and the share of such
*cestui que trust* in the income should be paid over
to the wife or children, if any; and if not, the
income was to accumulate in augmentation of the
principal fund. But there was another proviso by
which, if there should be a cessor for any of the
reasons mentioned, and no wife or children, that
in such case the trustees might place, in their dis-
cretion, the share of such beneficiary in the in-
come at the disposal of the beneficiary for his use
and support. The controversy was chiefly over this
latter clause, the assignee in bankruptcy suing for
the income, there being no wife or children. The
Court unanimously held the trust valid, and that
the assignee could recover nothing. The Court dis-
cuss the case upon two propositions—first, that such
restrictions were valid under the English decisions,
and, second, that the limitations which the courts
of England have placed upon the power of testa-

mentary disposition were not sound, and ought not to be accepted. The Court expressly say: "The judgment of the Court may rest equally well on either of the propositions which we have discussed. We think the decree of the Court below may be satisfactorily affirmed on both of them." Upon the general question of the validity of restrictions upon the use of such trusts the . Court, among other things, say:

"But while we have thus attempted to show that Mrs. Eaton's will is valid in all its parts upon the extremist doctrine of the English Chancery Courts, we do not wish to have it understood that we accept the limitations which that court has placed upon the power of testamentary disposition of property by its owner. We do not see, as implied in the remark of Lord Eldon, that the power of alienation is a necessary incident to a life estate in real property, or that the rents and profits of real property and the interest and dividends of personal property may not be enjoyed by an individual without liability for his debts being attached as a necessary incident to such enjoyment. This doctrine is one which the English chancery court has engrafted upon the common law for the benefit of creditors, and is comparatively of modern origin. We concede that there are limitations which public policy or general statutes impose upon all dispositions of property, such as those designed to prevent perpetuities and accumulations of real estate in corporations and ecclesiastical bodies. We also admit that there

Jourolmon *v.* Massengill.

is a just and sound policy peculiarly appropriate to the jurisdiction of courts of equity to protect creditors against fraud upon their rights, whether they be actual frauds or constructive frauds. But the doctrine that the owner of property, in the free exercise of his will in disposing of it, cannot so dispose of it but that the object of his bounty, who parts with nothing in return, must hold it subject to the debts due his creditors, though that may soon deprive him of all the benefits sought to be conferred by the testator's affection or generosity, is one which we are not prepared to announce as the doctrine of this Court. If the doctrine is to be sustained at all, it must rest exclusively on the rights of creditors. Whatever may be the extent of those rights in England, the policy of the States of this Union, as expressed both by their statutes and the decisions of their courts, has not been carried so far in that direction."

After discussing the arguments already alluded to in the earlier parts of this opinion as to the possibility of creditors being misled, the Court add:

"Nor do we see any reason in the recognized tenure and nature of property and its transfer by will, why a testator—who gives without any pecuniary return, who gets nothing of property value from the donee—may not attach to that gift the incident of continued use, of uninterrupted benefit of the gift during the life of the donee. Why a parent, or one who loves another and wishes to use his own property in securing the object of his

affection, as far as property can do it, from the ills of life, the vicissitudes of fortune, and even his own improvidence or incapacity for self-protection, should not be permitted to do so, is not readily perceived. These views are well supported by adjudged cases in the State courts of the highest character."

We have not had access to all the American cases cited by counsel, and for the holding of some of these cases we have had to rely upon text writers and citations in other decisions. But it cannot be disputed with success that the statement is true that the great weight of authority in this country is in accord with the conclusions of the United States Supreme Court. The Supreme Court of Massachusetts have lately had under consideration this question, and in the case of *Broadway Bank* v. *Adams*, 133 Mass., 170, they held by a unanimous Court "that a person having the entire right to dispose of property may settle it in trust. in favor of another with the provision that the income shall not be alienated by the beneficiary by anticipation, or be subject to be taken by his creditors in advance of its payment to him, although there is no cessor or limitation of the estate in such an event. The trust in that case was created by will, and a fund was placed in the hands of the executors "in trust to invest," "and pay income thereof semi-annually to my son, Charles W. Adams," personally or upon his order or receipt in writing, "in either case free from the in-

terference or control of his creditors, my intention being that the use of said income shall not be anticipated by assignment." A bill was filed in equity by a creditor of the beneficiary, which, upon full consideration, was dismissed, the Court holding that the interest of the *cestui que trust* was not liable to the demands of creditors. This result was reached without regard to any statute, upon the general proposition that there was nothing in the nature or tenure of property, nor any principle of public policy, which prevented a donor from so giving his own that it should not be liable to the debts of his donee.

The courts of Pennsylvania have long rejected the English doctrine, and have sustained such trusts. *Holdship* v. *Patterson*, 7 Watts, 547; *Rife* v. *Geyer*, 59 Penn. St., 393.

In the case of Shankland's Appeal, 47 Penn. St., 113, it was held that a devise to a son of the rents and profits of an estate during his natural life, without being subject to his debts and liabilities, is a valid trust, and the estate being vested in trustees the son could not alienate.

So in Connecticut it was held that it was in the power of a parent to place property in hands of trustees for the benefit of son and wife or children, with power in them to manage and apply it at their discretion, without any power in the son to interfere in that management. *Leavett* v. *Brown*, 21 Conn., 1.

Such trusts have been sustained in Vermont. See *White* v. *White*, 30 Vt., 338.

So in Virginia it was held that "there was nothing in the nature or law of property" which would prevent a testatrix from appropriating her property to the support of her poor and helpless relatives, and, said the Court, "there is nothing in law or reason which should prevent her from appointing a trustee to administer her bounty." *Nickell* v. *Handley*, 10 Gratt., 336.

The case of *Pope* v. *Elliott* places Kentucky strongly on the side of the American rule, the Court saying that "there was nothing in the statutes of that State, or the general principles of jurisprudence, or in considerations of public policy," which forbids the creation of such trusts. 8 B. Mon., 56.

Such trusts are supported and sustained by the courts of New York, and this has been so for a period of fifty years. The leading case of *Campbell* v. *Foster*, 35 N. Y., 361, refers to a number of cases sustaining such trusts. If it be said that the New York cases rest chiefly upon their statute, depriving the courts of equity of jurisdiction to sustain a creditor's bill where the trust proceeds from one other than the debtor, then we reply that we have precisely the same statute. Theirs was enacted in 1828, and in 1832 we copied and re-enacted it.

From both reason and authority it thus appears to us that there was nothing inherent in the law or tenure of property, nor any sound principle of public policy, which interferes with the power of a tes-

tator to so guard his gift that it shall not be subject to the creditors of his donee. Up to 1832 there was neither decision nor statute which would have prevented such limitation upon a trust.

We learn from a note by the learned editor of Cooper's edition of Tennessee Reports that the case of *Erwin* v. *Oldham,* reported in 6 Yer., 186, was argued in March, 1832, and continued under advisement until March, 1834, but that at the original argument an intimation from the Court resulted in the passage of the act of 1832. Prior to the passage of this act, it was in consequence of the decision in that certain case that Chancery Courts had no inherent jurisdiction, in the absence of fraud or trust, to aid a judgment creditor in subjecting to the satisfaction of his debts, stocks, credits, and rights of action held by the debtor.

The uncertain extent of the power of the Chancery Court to aid a creditor to reach intangible personal property not subject to execution is not only shown by the case of *Erwin* v. *Oldham,* but by the subsequent case of *Ewing* v. *Cantrell,* where it was held: "The jurisdiction of the Chancery Court, under the statute against fraudulent conveyances being ancillary, namely, to remove impediments to executions at law, will be exercised only where the impediment to be removed affects things which might be reached by execution but for the impediment; never, in any case, where the property sought to be made liable in equity, could not be reached at law, even though no obstruction ex-

isted." *Ewing* v. *Cantrell*, Meigs, 364; *Graham* v. *Murrill*, 5 Cold., 633.

These decisions, as to the jurisdiction of courts of equity, independent of the Act of 1832, and subsequent acts, make it at least doubtful whether a court of equity had jurisdiction to reach and subject to the satisfaction of a judgment creditor any purely equitable interest of the debtor, if the interest was such an one as could not be subjected to execution, and it had not been put in such attitude by the fraud of the debtor. Even though the better opinion should be that courts of equity had inherent jurisdiction to subject a trust fund in which the debtor had an interest, yet the question was a disputed one in this State as it was in New York. The Chancery Court of New York had pronounced a decision similar to that in the case of *Erwin* v. *Oldham—Donnovan* v. *Finn*, Hop., 59— and upon the authority of the New York case our case rests. The New York case was followed by their Act of 1828, identical in substance with our Act of 1832. Upon full consideration of the effect of the Act of 1828, the New York Court of Appeals say, "that before the statute it was an unsettled point whether courts of equity had jurisdiction over the subject; and when, therefore, in the language of the Chief Justice, in *Groff* v. *Bonnett*, 31 New York, 9, the Legislature came to define the cases and prescribe the manner in which intangible personal property should be subjected to the satisfaction of the debts of the owner, the

provision ought to be considered exclusive of any other authority for effecting the same end." *Campbell* v. *Foster*, 35 N. Y., 366.

This New York act was adopted by the legislative branch of the government of this State, to meet the same defects in and disputes as to the jurisdiction of our Chancery Court. It is in the following words: "Section 1. That whenever an execution against the property of a defendant shall have been issued on a judgment at law or decree in equity, and shall have been returned unsatisfied, in whole or in part, the party suing out such execution may file a bill in chancery against such defendant, and any other person or body corporate, to compel the discovery of any bank stock or other kind of stock, or of any property or thing in action due to him, or held in trust for him, and to prevent the transfer of any such stock, property, money, or thing in action, or the payment or delivery thereof to the defendant *except where such trust has been created by, or the fund so held in trust has proceeded from, some person other than the defendant himself, and is declared by will duly recorded, or by deed duly proved and registered.*"

The second section provides that the Court shall have jurisdiction to decree satisfaction out of the property so impounded, belonging to the defendant, or held in trust for him, with the exception named above. The third section provides for the registration of judgments. The fourth and last section provided for the case of one who could not pro-

cure personal service of process at law, or where no original attachment would lie at law, and no judgment at. law obtained, and also where the demand was purely of an equitable nature, that jurisdiction exists to sustain a bill and subject legal and equitable interest, "*with the exception above named,*" to the satisfaction of the demand of such creditor.

This act is carried into the Code with no material or significant change at Sections 4283, 4284, 4285, 4286, and 4287. Now, in view of the doubt as to the inherent jurisdiction of the chancery court to reach property held in trust for another which was not subject to execution at law, we are disposed to say with the New York Court concerning the same disputed jurisdiction and the same legislative settlement, "that when the Legislature came to define the cases and prescribe the manner by which intangible personal property should be subjected to the satisfaction of the debts of the owner, the provision ought to be regarded as exclusive of any other authority for effecting the same end." 35 N. Y., 366.

Here, then, is an express and positive legislative limitation upon the jurisdiction of the Chancery Court. We can put no other meaning upon this legislation than that it is not in the power of a court of equity to subject to the satisfaction of the demands of a creditor the income of a trust fund, whether the fund or property be realty or personalty, where such trust was created by one

other than the debtor. This effect has been given to this act by the courts of New York in several cases, and we see no way in which we can avoid this result. Whether the court had jurisdiction or not before this act must be immaterial; any fair and reasonable construction · of the act must result in holding that thereafter the jurisdiction was gone. The policy of the act may be disapproved, but, until repealed, we must enforce it. Its policy, however, is, as we have seen, in full accord with reason and the great weight of American decision.

Until the passage of this enactment it was within the authority of this Court—if it be assumed that the Court had jurisdiction prior thereto—to adopt and announce the doctrine of the English courts, which the Supreme Court of the United States characterizes as "one which the English Chancery Court has engrafted upon the common law for the benefit of creditors, and of comparatively recent origin;" or, taking a broader view of the right of a testator to guard his bounty by limiting the use to that of the donee, have held, in accordance with the great current of American authority, "that the creditor is neither misled nor defrauded when the object of the testator is carried out by excluding him from any benefit of such a devise." *Nichols* v. *Eaton*, 1 Otto, 716.

After the Act of 1832, whether it be regarded as depriving the Chancery Court of jurisdiction to aid the creditor to subject such a devise or not, it must be at least regarded as a legislative decla-

ration of public policy in regard to such trusts, and as strongly persuasive to this Court that such trusts ought not, upon a fancied contravention of public policy, be overthrown. That act we believe to have been regarded with great unanimity by the bar of this State as putting at rest the question of the validity of such trusts until the decision of the case of *Turley* v. *Massengill.* In 1859 the question was squarely presented to this Court in the case of *Nichols* v. *Levy*, decided at Nashville. There was no written opinion, but the decision was by Judge McKinney. The decree in the cause shows the character of the trust and the decision of the Court. It was as follows:

"Be it remembered that this cause came on to be heard on the 30th of January, 1859, before the Supreme Court of the State of Tennessee sitting at the city of Nashville, on the transcript of the record from the Chancery Court at Nashville. And it appearing that Beal Bosley executed his deed of date of 13th of October, 1849, and thereby conveyed to John Nichols, Sr., father of the defendants, James B. and John Nichols, Jr., and his heirs forever, a certain tract of land in Davidson County, near the city of Nashville, containing 308 acres, and other property in the pleadings mentioned, in trust to permit said Beal Bosley to possess, use, and occupy said lands and other property for and during his natural life, and after his death to *permit said* James B. Nichols and John Nichols, Jr., jointly or severally, according to any division into

two equal parts that may thereafter be made between them, and *to have possession, use, occupy, and enjoy said property,* and receive *the rents, issues, and profits thereof,* but so that neither the said property, nor the rents, issues, and profits thereof, shall ever be liable for any of the present, now existing debts, whether due or not due, or now existing contracts of said J. B. and John Nichols, Jr., or either of them, or to any incumbrance, liability, or lien that they, or either of them, or their property, are now subject to for such debts or contracts, or by any act, default, or transaction of their own whereby they may attempt to make the same liable for said debts or contracts; and after the present debts and liabilities shall have been extinguished and they entirely discharged therefrom, *then* the said John Nichols, Sr., should hold said property, and every part thereof, in trust to convey the same to the said J. B. and John Nichols, Jr., in fee and absolutely either as tenants in common or in severalty, and in such manner as may be agreed upon by and between them. It further appearing that all of the debts of all the complainants were in existence at the date of the execution of the deed, and were subsequently reduced to judgments in the Circuit Court of the United States at Nashville, and that said John Nichols, Sr., has departed this life, leaving the defendants as his heirs at law, *and it being the opinion of this Court that said property is not liable for said debts and judgments of complainants, and that*

*the same may not be subjected to the payment and satisfaction of said debts and judgments,* it is ordered and decreed that the decree of the Chancellor be affirmed."

Chancellor Cooper was of counsel for the Nichols in that case, and he states, in the case of *Hooberry* v. *Harding,* 3 Tenn. Ch. Rep., 677—a case involving a trust of the kind now under consideration, and which he sustained as valid—that the opinion was delivered by Judge McKinney, and "that it was based upon the statute, and turned upon the power of the donor of property, by will recorded or deed registered, to fix upon it a trust for the benefit of the objects of the bounty to the exclusion of creditors. Some of the creditors of the Nichols, who were parties to the case mentioned, together with others not parties, subsequently instituted another suit in the Federal Court to reach and subject the interest of Nichols under this trust. This new case, upon appeal, was heard in the Supreme Court of the United States, and is reported in 5 Wall., 444. In this latter opinion the Court states the substance of the former litigation in the State Court over the same trust, and say:

"The Supreme Court of the State decided in the suits referred to that this statute (the Act of 1832) embraces trusts of real estate, and that it exempted the property in question from liability to the judgment creditors. There can be no doubt of the power of the Legislature to pass the statute. Its wisdom and policy are considerations with which we have nothing to do. Being a local stat-

ute and involving a rule of property, we adopt
the construction which has been given to it by the
highest judicial tribunal of the State."

This case of *Nichols* v. *Levy*, as decided by this
Court, and the subsequent adoption of the construc-
tion of the Act of 1832 by the Supreme Court of
the United States, has been regarded as settling
the construction of the act in question, and as
finally settling the validity of such trusts. The
act and the decision constituted a rule of prop-
erty, and it is believed that very many such trusts
have been created in reliance upon it. The cases
of *Turley* v. *Massengill*, 7 Lea, 353, and *Hooberry* v.
*Harding*, 10 Lea, 392, if assented to, practically repeal
this statute and overturn a rule of property ac-
quiesced in for nearly fifty years. Both cases are
recent. One of them involved the very trust now
under consideration. The first was decided by a
divided Court, Judge Turney dissenting, of which
two members were special judges. It has been
followed but once, and it is believed that it has
not met with approval of the lawyers of the State.
We recognize the importance of stability of decis-
ions, especially when a decision has become a rule
of property. But these cases do not establish a
rule of property, but overturn such a rule, and
are destructive of large property interests created
upon the faith of the meaning of a plain and
positive statute, subsequently construed by this
Court, and such construction adopted by the high-
est court in the Union.

Jourolmon *v.* Massengill.

This decision is ignored and not even alluded to. In the view we take of these cases they not only reversed a previous decision of this Court acquiesced in for over twenty years, but they virtually repeal a legislative enactment intended to conserve and protect just such trusts. They are not supported by the weight of American authority, and are not supported by reason or considerations of sound public policy. To use the language of one of our most eminent predecessors—Judge Haywood:

"Being thus unequivocally wrong, and destitute of individual right in a very extensive and eminent degree, it cannot, in my apprehension, be the duty of the present Judges, because of any judgments already pronounced, to adhere to the rule of construction. Comity is not entitled to so great a sacrifice; uniformity of decision is of far less moment than the security and repose of the whole community." *Barton's Lessee* v. *Shall,* Peck, 239.

Said another most eminent lawyer, sitting as a Special Judge, and delivering the opinion of this Court:

"Where a decision or a series of decisions have established a rule of property, and more particularly a rule affecting title to real estate, which has become generally known and been acted upon, such a land-mark should not be disturbed. But when there is no such restraining consideration; when the thing determined is of recent origin, not supported by former precedents, but contrary to the

highest and most respectable authorities of other States and of the United States, where the decision has not met the approbation of the profession at large, such decisions should be examined without fear and reversed without reluctance." Special Judge Shields, 1 Heis., 143.

We are, from these premises, constrained to overrule the two cases in conflict with the views we here announce. We therefore hold that the will under consideration imposes upon the trustee, "either expressly or by implication," the active duty of managing the estate devised, and to so control the use of it by Massengill that the rents and issues shall be applied to the support of Massengill, and that such rent and income, as well as the corpus of the estate, are not subject to the debts of the said beneficiary. The property was, therefore, the subject of a valid active trust, and hence not subject to levy and sale by execution, and cannot be reached by the creditors through the instrumentality of the Chancery Court. The sale and conveyance by the Sheriff are void. The decree of the Chancellor is reversed, with all costs.

Snodgrass, J., dissents as to overruling the former cases.