MAGEVNEY *et al. v.* KARSCH *et al.*

(*Nashville,* December Term, 1933.)

Opinion filed December 9, 1933.

34

METCALF, METCALF & APPERSON, BURCH, MINOR & MC-
KAY, and JAMES J. PLEASANT, all of Memphis, and ED. T.
SEAY, of Nashville, for appellants.

HOLMES, CANALE, LOCH & GLANKLER and BATES, SHEA
& FRAZER, SIVLEY, EVANS & McCADDEN, HAMILTON E.

LITTLE, CRABTREE & CRABTREE, PRATHER S. McDONALD, and EWING WERLEIN, all of Memphis, and K. T. McCONNICO, of Nashville, for complainants.

METCALF, METCALF & APPERSON, BURCH, MINOR & McKAY, and JAMES J. PLEASANTS, JR., all of Memphis, and ED. T. SEAY, of Nashville, for defendants.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This case presents a contest over the estate of the late Mrs. Kate E. Hamilton, who died intestate in Memphis in December, 1930. The defendant Mrs. Karsch claims the entire estate as a daughter of the deceased by adoption. The complainants are the next of kin of Mrs. Hamilton, in which right they claim, and the primary basis of their bill is that the adoption proceedings were invalid and conferred no rights on Mrs. Karsch. The complainants also claim the real estate as heirs of the late Eugene Magevney; their contention in this respect being founded on the proposition that, under the will of Eugene Magevney, his daughter Mrs. Hamilton did not acquire an absolute title to such real estate.

The chancellor denied all relief to complainants. The Court of Appeals held that Mrs. Hamilton had only a life interest in the realty and that it passed to complainants on her death; that Eugene Magevney was intestate as to the reversion of said real estate.

The property involved is said to be of the value of $3,500,000; the personalty being valued at $1,500,000, and the real estate being valued at $2,000,000. The question of the validity of the adoption is determinative of the complainants' claim to the personal property, since it is conceded that Mrs. Hamilton owned the personalty outright.

Eugene Magevney, the father of Mrs. Hamilton, died in Memphis many years ago, leaving a considerable estate which has increased greatly in value during the years elapsing. He left two daughters, the defendant, Mrs. Hamilton, and another daughter who became a nun in the Roman Catholic Church and was known as Sister, later Mother, Mary Agnes. Testator left the residue of his estate to his daughter Kate, after certain provisions for his widow, his other daughter, his sister, and some orphan children.

The daughter Kate was married twice, but had no children of her own by either marriage. Her first husband was named Dawson; her second, Hamilton. Just prior to her second marriage in January, 1882, Mrs. Hamilton (then Mrs. Dawson), in company with Sister Mary Agnes, made a trip to New York. It seems from the proof that on that trip Sister Mary Agnes told of a child whom the sisters at the convent where she was located had been caring for and to which child she had become very much attached. Shortly before, the parents of this child had taken her away from the convent and from the Sisters who had nurtured her, very much to the distress of the latter. On this trip to New York, Sister Mary Agnes disclosed her intention of procuring while there another child to take back to the convent. She wanted a child whose parents were dead and who could not later be reclaimed. Such a child was found in New York, an outfit purchased for her, and the child was taken back to the convent by Sister Mary Agnes, and became the defendant Mrs. Karsch.

Mrs. Hamilton, after her second marriage, continued to live in Memphis, and the child generally stayed during the school year with Sister Mary Agnes at a convent in Ohio and later at a convent in Texas when Sister Mary

Agnes went there. The little girl spent her vacations and other periods with Mrs. Hamilton in Memphis. Mrs. Hamilton developed a great affection for the girl, and, at the death of Sister (then Mother) Mary Agnes in 1891, brought the girl to Memphis, where she lived with Mrs. Hamilton, was treated as Mrs. Hamilton's daughter, and went by the name of Blanche Hamilton. Blanche Hamilton married Dr. Joseph H. Karsch on January 14, 1903. While, after her marriage, she had a home of her own, the relations between her and Mrs. Hamilton continued to be close and loving until the death of the latter. The record contains many evidences of the mutual affection existing between these two.

In 1897 Mrs. Hamilton undertook to adopt this girl by proceedings in the probate court of Shelby county, and it is these proceedings that are attacked herein as being ineffective and void.

The adoption statutes of Tennessee at that time are contained in Shannon's Code as follows:

"5402. The circuit and county courts of this state have concurrent jurisdiction to change names, to legitimate, and authorize the adoption of children, on the application of a resident citizen of the county in which the application is made."

"5409. Any person wishing to adopt another as his child, shall apply by petition, signed by the applicant, and setting forth the reasons therefor, and the terms of the aforesaid adoption.

"5410. The court, if satisfied with the reasons given. may sanction the adoption by decree, entered upon the minutes, embodying the petition, and directing the terms of adoption.

"5411. The effect of such adoption, unless especially

restrained by the decree, is to confer upon the person adopted, all the privileges of a legitimate child to the applicant, with capacity to inherit and succeed to the real and personal estate of such applicant, as heir and next of kin; but it gives to the person seeking the adoption no mutual rights of inheritance and succession, nor any interest whatever in the estate of the person adopted.

"5412. In cases of legitimation and adoption, the name of the person sought to be legitimated or adopted may be changed by proper prayer for that purpose inserted in the petition."

The decree entered in the adoption proceedings, which decree contains the petition, as required by the statute, is in these words:

"In the Matter of the Adoption of Blanche Donnelly by Kate Hamilton.

"No. 8966 R. 12.

"This cause came on this day to be heard before the Hon. J. S. Galloway, sole presiding Judge of said Court upon the petition of Kate E. Hamilton for the adoption of Blanche Donnelly, which is as follows, to-wit:—"To the Hon. J. S. Galloway, Judge of the Probate Court of Shelby County, Tennessee:

"Your petitioner, Kate E. Hamilton would respectfully represent unto your Honor that she is a citizen and resident of Shelby County, Tennessee; that she has no children of her own and greatly desires to adopt Blanche Donnelly as her own child to her born, giving her the same care, attention, love and protection, maintenance, education and support, bear her surname, remain in her exclusive possession and control and have the right of inheritance and distribution in her estate, as if she were born unto her, and from a sense of duty and affection

she desires to adopt the said Blanche Donnelly as her own child in every respect.

"Premises considered, petitioner prays that this petition be filed and considered by the Court; that petitioner have a decree herein declaring the said Blanche Donnelly to be her daughter by adoption, with all the rights and privileges of a child to her born; that she have the exclusive possession and control of said Blanche Donnelly, free from the let or hindrance of all others; and that she be held responsible for her maintenance, education and support; and that her name be changed from Blanche Donnelly to Blanche Hamilton and that your petitioner have all other and further relief according to the Statutes in such cases made and provided, and as the facts warrant, and petitioner will ever pray, etc.

"July 1st, 1897.

"Kate E. Hamilton.

"Subscribed and sworn to before me this July 1, 1897.

"R. A. Speed, Clerk,

"By Thos. B. Crenshaw, D. C.

"The Court is pleased to grant in every way the prayer of said petition for adoption, and doth hereby order and decree that the said Blanche Donnelly is hereby the adopted daughter of the said Kate E. Hamilton with all the rights of a child to her born. And the Court doth further order and decree that the name of said child be changed from Blanche Donnelly to Blanche Hamilton; all of which is this day ordered, adjudged and decreed, July 1, 1897."

The argument for the complainants is that adoption was unknown to the common law and that statutes providing for adoption must be strictly construed; that such statutes confer upon the courts a special power and that

this power must be exercised in strict compliance with the statute; that the judgment or decree of the court in such a case must show a literal observance of the provisions of the statute, or that otherwise a judgment of adoption is void.

The reply, generally speaking, is that adoption statutes do not require a strict construction under the weight of authority, and that the decree of the probate court herein, being a decree of a court of general jurisdiction, is not subject to this collateral attack.

The probate court of Shelby county is a court of record, and has all the powers of the county court with reference to adoption and like matters. Shannon's Code, section 387. The county court is a court of general jurisdiction in proceedings for the adoption of children. *Crocker* v. *Balch,* 104 Tenn., 6, 55 S. W., 307; *Redmond* v. *Wardrep,* 149 Tenn., 35, 257 S. W., 394.

The complainants insist that, where the jurisdiction exercised by a court, even of general jurisdiction, is dependent upon a special statute conferring an authority in derogation of the common law and specifying the manner in which such authority shall be employed, a judgment arising from the exercise of this jurisdiction will not be supported by the ordinary presumptions attending the judgments of courts of record, but, if jurisdictional facts do not appear of record, the judgment will be treated as void.

The rule is so stated in many cases referred to by the complainants, but all such statements must be considered with reference to the circumstances of the case before the court. Such a statement of the rule, as above indicated, is too broad, in our opinion, at least so far as the decisions of this court are concerned.

██ If the procedure laid down in the statute conferring the new power or new right is such procedure as ordinarily prevails in courts of common law and equity, then there is nothing derogatory to common-law practice and equity practice in the matter of procedure. There is no reason, therefore, to apply any rule of strict construction to statutory procedure of this nature.

On the other hand, if the rights conferred or status created by the new law be in derogation of rights existing at common law, the rule of strict construction is applied to the rights and status so arising, under our cases.

In *Harvey* v. *Tyler*, 2 Wall., 328, 342, 17 L. Ed., 871, the Supreme Court of the United States said:

"The jurisdiction which is now exercised by the common law courts in this country, is, in a very large proportion, dependent upon special statutes conferring it. Many of these statutes create, for the first time, the rights which the court is called upon to enforce, and many of them prescribe with minuteness the mode in which these rights are to be pursued in the courts. Many of the powers thus granted to the court are not only at variance with the common law, but often in derogation of that law. In all cases where the new powers, thus conferred, are to be brought into action in the usual form of common law or chancery proceedings, we apprehend there can be little doubt that the same presumptions as to the jurisdiction of the court and the conclusiveness of its action will be made, as in cases falling more strictly within the usual powers of the court. On the other hand, powers may be conferred on the court and duties required of it, to be exercised in a special and often summary manner, in which the order or judgment of the

court can only be supported by a record which shows that it had jurisdiction of the case.''

In *Galpin* v. *Page,* 18 Wall., 350, 371, 21 L. Ed., 959, the Supreme Court further said:

" 'A court of general jurisdiction,' says the Supreme Court of New Hampshire, 'may have special and summary powers, wholly derived from statutes, not exercised according to the course of the common law, and which do not belong to it as a court of general jurisdiction. In such cases, its decisions must be regarded and treated like those of courts of limited and special jurisdiction. The jurisdiction in such cases, both as to the subject-matter of the judgment, and as to the persons to be affected by it, must appear by the record; and everything will be presumed to be without the jurisdiction which does not distinctly appear to be within it.' *Morse* v. *Presby,* 5 Fost. (25 N. H.), 302. The qualification here made that the special powers conferred are not exercised according to the course of the common law is important. When the special powers conferred are brought into action according to the course of that law, that is, in the usual form of common-law and chancery proceedings, by regular process and personal service, where a personal judgment or decree is asked, or by seizure or attachment of the property where a judgment *in rem* is sought, the same presumption of jurisdiction will usually attend the judgments of the court as in cases falling within its general powers.''

In the last quotation the court is evidently referring to proceedings strictly *in rem,* not *quasi in rem,* such as our attachment laws provide, which practice is not according to the course of the common law.

The foregoing expressions from the Supreme Court of

the United States might have served as a chart for all the decisions of this court, except one class of cases, wherein it has been declared that the record must disclose the existence of statutory prerequisites to the exercise of special powers by a court of general jurisdiction. They were cases in which the procedure prescribed by the statute was out of line with conventional common-law and equity practice. They involved summary proceedings against delinquent officers, summary judgments over by sureties, statutory remedies for the collection of taxes, proceedings by attachment and otherwise upon publication and without service of process, and other procedure not known to courts of common law and to courts of equity. The cases are detailed in note 1 hereto.

The exceptional cases above mentioned are those under the statute authorizing a suit by an administrator to sell a decedent's land to pay his debts. It is said in some of those cases that the record must disclose the compliance with all preliminary steps required by the statute before a decree of sale will be regarded as valid, even though the practice in such cases is according to the usual practice in courts of equity. Among these cases are *Starkey* v. *Hammer*, 60 Tenn. (1 Baxt.), 438; *Kindell* v. *Titus*, 56 Tenn. (9 Heisk.), 729; *Young* v. *Young*, 80 Tenn. (12 Lea), 335. We are also referred in this connection to *Linnville* v. *Darby*, 60 Tenn. (1 Baxt.), 308, but it was denied in that case that the county court was a court of general jurisdiction in the premises.

Of these cases it may be said that they have for their object the divesting title to land out of the heirs in whom such title vested upon the ancestor's death. Vested rights, not expectancies, are touched. The courts have been disposed to regard disturbance of these rights a

grave matter. However, the authority of the cases mentioned was weakened by *Doherty & Boyd* v. *Choate,* 84 Tenn. (16 Lea), 193, and their authority still further shaken by the decision of the court in *Puckett* v. *Wynns,* 132 Tenn., 513, 178 S. W., 1184. In the latter case a decree of the county court, pronounced in a suit brought under the statute to sell the land of decedent for debts, was accorded the benefit practically of the presumptions which attend a decree of the chancery court in an ordinary case. The immunity of an old judgment was emphasized.

Now to adopt the rule announced by the Supreme Court of the United States and to apply that rule to this case: Construing our adoption statutes, this court has said that, while they do not provide for notice to the natural parents of the child to be adopted, "they do provide for proceedings in courts of record, and of course it must be presumed that the Legislature intended that such proceedings would be in accordance with the usual practice of such courts." *In re Knott,* 138 Tenn., 349, 197 S. W., 1097, 1098.

We may add that, although the statutes do not in terms provide for consideration of the welfare of the child involved, such consideration is paramount in all courts of record in proceedings involving the custody of children. *State ex rel.* v. *West,* 139 Tenn., 523, 201 S. W., 743, Ann. Cas., 1918D, 749; *State ex rel.* v. *Kilvington,* 100 Tenn., 227, 45 S. W., 433, 41 L. R. A., 284; *State ex rel.* v. *Paine,* 23 Tenn. (4 Humph.), 523. The advantage to the child is doubtless also one of "the reasons" mentioned in the statute to be set forth in the petition for adoption. So it must be presumed the Legislature intended that in an adoption proceedings, as in other proceedings in courts

of record involving the disposition of a child, high regard was to be paid to the best interest of that child.

Our adoption statutes so construed contemplate the usual accompaniments of judicial procedure, in giving a competent court, providing notice to adverse parties, a subject of judicial inquiry and a hearing and judgment. Upon the authorities cited, the judgment rendered should have the benefit of the usual presumptions upholding judgments of courts of general jurisdiction.

Much is said with respect to the reference to the rule of strict construction, as applicable to our adoption statutes, contained in *Re Knott, supra.* The first citation by Justice LANSDEN in that case is *Hockaday* v. *Lynn,* 200 Mo., 456, 98 S. W., 585, 586, 8 L. R. A. (N. S.), 117, 118 Am. St. Rep., 672, 9 Ann. Cas., 775, which is perhaps the most comprehensive judicial discussion of the adoption of children to be found. The court therein says:

"Adoption being unknown to the common law and in derogation of it, statutes of adoption have always been more or less strictly construed as against the adopted child. . . . Strict construction, however, is not extended to the act of adoption itself. That is liberally construed in favor of the child adopted."

The decisions of this court are in exact accord with the foregoing. The procedure in adoption cases, not being different from the procedure customarily employed in courts of equity and courts of common law, this court has not construed the statutes strictly as to procedure. *Crocker* v. *Balch,* 104 Tenn., 6, 55 S. W., 307; *Redmond* v. *Wardrep,* 149 Tenn., 35, 257 S. W., 394.

On the other hand, the status resulting from adoption, being unknown to the common law, has been strictly construed. It has been held that the child does not inherit

from collateral relatives of the adoptive parent, *Taylor* v. *Taylor*, 162 Tenn., 482, 40 S. W. (2d), 393, and that the widow of the adoptive father, upon the latter's death, does not succeed to the custody of the adoptive child against the child's mother, *Baskette* v. *Streight*, 106 Tenn., 549, 62 S. W., 142.

We have before us a case in which there was an adoption decree passed by a court of general jurisdiction more than thirty years ago. We are satisfied that, under our decisions, such a decree as is here up for examination is not subject to collateral attack by these complainants. So far as they appear as next of kin of Mrs. Hamilton, and their only claim to the personal property is in such right, these complainants are, of course, in privity with Mrs. Hamilton.

Where an attack is made upon a judgment or decree of a court of general jurisdiction by parties or their privies, such judgment or decree cannot be questioned except for want of authority over the matters adjudicated upon, and this want of authority must be found in the record itself. In the absence of anything in the record to impeach the right of such court to determine the question involved, there as a conclusive presumption that it had such a right. *Wilkins* v. *McCorkle*, 112 Tenn., 688, 80 S. W., 834; *Reinhardt* v. *Nealis*, 101 Tenn., 169, 46 S. W., 446; *Crocker* v. *Balch, supra.*

Although a contrary insistence is made, we find nothing in the record to impeach the right of the probate court of Shelby county to determine the question of the adoption of this child. The decree sets out the petition, and, while that petition is inartificial, we think it is a defective statement of a good cause, rather than a petition which states no cause at all. The petition states

the reasons, so far as Mrs. Hamilton is concerned, that influence her wish to adopt the child; that she has no children of her own; that she wishes to adopt this child and to provide for her care, maintenance, education, etc., and to give her the right of inheritance and distribution in petitioner's estate; that all this comes about from petitioner's sense of duty and affection towards the child.

True the petition does not make the natural parents parties thereto, nor does it allege that the parents are dead or have abandoned the child, nor that the best interests of the child would be promoted by an adoption decree. None of these things, however, are invariably required as a matter of pleading, by the statute. The court said in *Re Knott, supra,* that adoption statutes, to be constitutional, must be construed so as to authorize the adoption of a child by strangers only in cases where the natural parents consented to the adoption, or where the proof showed that the child had been abandoned by its parents or that it was manifestly to the interest of the child that it be taken from the custody of its parents by some judicial proceedings of which they had notice. That the mere fact that a petitioner wishes to adopt a child and was in better financial condition than its parents "will never authorize a decree of an adoption." However, if the parents of the child were dead at the time of the proceedings, there could be no question of consent or abandonment nor of their presence in the case.

The things detailed in *Re Knott* were set out as prerequisite to a *decree of adoption,* not as essentials of the petition. These prerequisites enumerated were all matters that were probably shown to the court herein. They were the issues to be determined by the court before any decree of adoption could have been passed.

The rule is well settled that, although a pleading contains a defect, either in substance or form, that would have been fatal on demurrer, yet if on the trial the issues required proof of the facts so defectively stated or omitted, the defect is cured by the verdict or the judgment. *Morriss Bros.* v. *Bowers,* 105 Tenn., 59, 58 S. W., 328; *Memphis Gayoso Gas Co.* v. *Williamson,* 56 Tenn. (9 Heisk.), 314.

In *Pope* v. *Harrison,* 84 Tenn. (16 Lea), 82, this court, following authorities cited, stated at some length the presumptions attending a decree of a court of general jurisdiction. It was there said:

"The record, however, may be silent upon the subject of jurisdiction. It may fail to show whether the proceedings taken to bring the defendant within the authority of the court were sufficient or insufficient; or, from aught that appears by the judgment roll, no attempt may have been made to perform some act essential to jurisdiction. 'Nothing shall be intended to be out of the jurisdiction of the superior court but that which expressly appears to be so.' Hence, though the existence of any jurisdictional fact may not be affirmed upon the record, it will be presumed, upon a collateral attack, that the court, if of general jurisdiction, has acted correctly and with due authority, and its judgments will be as valid as though every fact necessary to jurisdiction affirmatively appeared."

The record before us does not affirmatively show that the natural parents of the adopted child were not dead at the time of the proceedings. The presumption therefore may obtain that they were dead and this fact was proven. The record does not affirmatively show that it was not for the best interests of this child that her adop-

tion by Mrs. Hamilton should be sanctioned. We may therefore presume, in view of this decree of a court of general jurisdiction, that the adoption was shown to be for the best interests of such child.

 Aside from the presumption just noted, in so far as complainants questioned the jurisdiction of the probate court to make the adoption decree for lack of necessary parties, it was indispensable to complainants' case to show that there were necessary parties who were omitted. More specifically, to sustain the assault made, it was incumbent on complainants to show that the child had natural parents at the time of the decree, not brought into the proceedings. This they have failed to do. It clearly appears from the adoption petition that Mrs. Hamilton was the custodian of the child at that time. She says that she wishes the girl "to *remain* in her exclusive possession and control."

 Much of the argument against the validity of the decree of adoption is based on the idea that the petition was insufficient in its allegations to give jurisdiction to the court to enter such a decree. We think the insufficiency pointed out is not jurisdictional. It is not suggested that the decree prejudiced the rights of the adopted child. On the contrary, the child, long since having attained her majority, is here vigorously fighting for the decree. So far as the rights of those interested adversely to the child are concerned, the contents of the pleadings in the adoption case are immaterial. The rights of an infant disclosed by the evidence are protected without regard to the pleading. *Moore* v. *Knight,* 74 Tenn. (6 Lea), 427. The guardian *ad litem* quite customarily files a mere formal answer for his infant ward. Chambliss' Gibson's Suits in Chancery, section 383.

To the extent then that the adoption decree secured or protected rights for the minor child, the action of the court in basing such decree on meager pleadings was not even erroneous, much less void.

 The complainants go outside the record of the adoption case and attack the decree therein for that the birth name of the child appears in that record as Blanche Donnelly, whereas complainants say her true name was Ann Donnelly. Misnomer, however, is only a matter of abatement, and, unless so pleaded, is not even open to challenge on direct appeal. *Hunter* v. *Swadley,* 141 Tenn., 156, 207 S. W., 730. It is not ground for collateral attack. Freeman on Judgments (5 Ed.), section 361.

We find nothing in *Re Knott, supra,* so earnestly pressed upon our consideration by complainants, contrary to the conclusion herein reached. The limit of that decision is that a decree of adoption passed in a case to which the living parents of the adopted child were not made parties is void as to such parents. It was not decided in that case, however, that such a decree was absolutely void and open to collateral attack by parties thereto. Indeed Justice LANSDEN, in support of the opinion, although he refers to *Furgeson* v. *Jones,* 17 Or., 204, 20 P., 842, 3 L. R. A., 620, 11 Am. St. Rep., 808, also cites *Ross* v. *Ross,* 129 Mass., 243, 37 Am. Rep., 321, holding to the contrary, and cites a note page 146 of 30 L. R. A. (N. S.), which shows the weight of authority to be that the fact that parents were not served with notice of proceedings to adopt their child does not render an order of adoption entered in such proceedings invalid as to the parties thereto and their privies, although the proceedings might be successfully attacked by the parents for that reason. It is to be kept in mind that complain-

ants claim the personalty here involved solely as distributees—privies in estate of Mrs. Hamilton.

The text-writers say that not every stranger is entitled to impeach a judgment. Only those strangers prejudiced in some existing right by such judgment can maintain a collateral attack. Freeman on Judgments (5 Ed.), section 319; Black on Judgments, section 260; 34 C. J., 526. That is, the assailant must show prejudice to some right of his that accrued prior to the rendition of the judgment. Of course Mrs. Hamilton's distributees had no rights in her estate prior to her death.

Whether regarded as strangers or as Mrs. Hamilton's privies, therefore, complainants have no standing to maintain this attack, and, for the reasons heretofore stated, we think the attack is not maintainable were complainants not so disabled.

We are not inappreciative of the diligence of counsel in collecting and submitting for our help the many authorities cited on the briefs. The array is too extensive to permit a review. We must close our discussion of this branch of the case with the observation that we cannot regard the adoption decree as void. The contrary contention, analyzed, has but two bases: Want of proper parties and insufficient pleadings. We cannot bring ourselves to treat as void, for want of parties, a judgment of a court of general jurisdiction with no showing that such parties in fact existed. Nor can we, for insufficient pleadings, scuttle such judgment, of a tenor that, under settled practice, authorized its entry upon the facts proven without regard to the pleadings.

This disposes of the case in so far as the personal property is concerned.

The title to the real estate depends upon the construc-

tion given to the will of Eugene Magevney. He died in 1873; his wife died in 1889. The daughter, Sister Mary Agnes, died in 1891. A sister of his, also provided for in the will, died many years ago.

At the time of his death, the personal estate of Eugene Magevney was valued at $29,000. His real estate was then assessed at $122,000.

The dispositive provisions of the will are as follows:

"1st. First, it is my will that my legal debts be promptly paid; and a decent tomb placed over my mortal remains.

"2d. I bequeath to my beloved wife, Mary Magevney, the homestead on Adams Street, together with all the appurtenances thereunto belonging, and also the two stores fronting on Union Street during her natural life. It is my will that she dispose of the lot on Poplar St., and use the proceeds when and how she wishes. It is also my will that the taxes of all descriptions upon the above or foregoing property bequeathed to my dearly beloved wife, be promptly paid by her, and also the insurance on the same and she shall keep the same in good condition and repair.

"3d. It is my will that my dearly beloved child, Mary J. Magevney (*alias* Sister Mary Agnes Magevney) having withdrawn herself (prudently) from the ever annoying and business life of viz. attending to renting, leasing and keeping business houses in repair; it is my will that she receive two thousand ($2,000.00) per annum; the same to be paid to her as she may require—

"4th. It is my will that my sister Kate Lilly receive $200.00 per annum during her life as she may demand or need it—

"5th. It is my will that the orphans of St. Peters

Church receive one hundred dollars per annum for five years after my demise—say five hundred in all as the Clergy of St. Peters may demand, or the orphans need it.

"6th. It is my will that the residue of my property both real and personal become the property of my daughter Kate Magevney (*alias*) Kate Dawson, during her life, and at her demise dispose of it as she pleases, this I bequeath to her sole and separate use, not to be subject to the contract of any husband she may have or marry, nor in any wise liable for his debts or contracts, but to the exclusion of all marital right of her husband.

"7th. It is my will that the stocks owned by me, and standing to my credit in the banks or offices in the City of Memphis, with other available means, may be used in improvements on Adams Street if she ever deems it proper to do so.

"8th. It is my will that my dearly beloved daughter, Kate Magevney (*alias*) Dawson, act as my sole executrix; and shall not be required by the Honorable Court of Shelby County to give either bond or security.

"Witness my hand and seal this 28th day of July, 1873.

"[Signed] EUGENE MAGEVNEY."

As noted above, all beneficiaries of the will died many years before Mrs. Hamilton. It is not questioned in this court that the remainder in the property given to testator's wife by item 2 of the will passed, upon the death of the life tenant, under item 6, to Mrs. Hamilton.

The chancellor was of the opinion that Mrs. Hamilton took an absolute estate in the property passing under item 6. The Court of Appeals was of opinion that she took only a life estate in this property. The chancellor applied one rule. The Court of Appeals applied another. Both rules are well established, nor disputed, and the

controversy before us is to be determined by deciding which of the two rules is here applicable.

The two rules are thus stated in *Bradley* v. *Carnes,* 94 Tenn., 27, 27 S. W., 1007, 45 Am. St. Rep., 696:

''If the first taker is given an estate in fee or for life, coupled with an unlimited power of disposition, the fee or absolute estate vests in the first taker, and the limitation over is void.''

''If the power is dependent upon a contingency, or if the power be definitely qualified, the estate of the first taker is limited to life, and the remainder over takes effect.''

The first rule has been applied in many cases, beginning with *Smith* v. *Bell,* 8 Tenn. (Mart. & Y.), 302, 17 Am. Dec., 798, and lastly in *Vandeventer* v. *McMullen,* 157 Tenn., 571, 11 S. W. (2d) 867. This rule, however, has now been circumscribed by the provisions of section 7603 of the Code of 1932, repeated in section 8093.

The second rule has been applied in many cases, beginning with *Henderson* v. *Vaulx,* 18 Tenn. (10 Yerg.), 30, and lastly in *Waller* v. *Sproles,* 160 Tenn., 11, 22 S. W. (2d), 4.

It perhaps should be remarked that expressions of disfavor of the first rule have appeared in several opinions of this court, as noted in *Waller* v. *Sproles, supra.* The rule has been thought by the court to have a decided tendency toward defeating the intention of the testator.

In three decisions of this court the rule first above stated has been somewhat extended. The result of these cases, as counsel for Mrs. Karsch contend, is that it is now established as a settled rule of property in Tennessee that a devise to one for life, coupled with the right of the devisee to dispose of the property at the death of the

devisee, as the devisee pleases, enlarges the life estate into a fee simple. The cases cited for this are *David* v. *Bridgman,* 10 Tenn. (2 Yerg.), 557; *Troup* v. *Hart,* 66 Tenn. (7 Baxt.), 188; *Turner* v. *Durham,* 80 Tenn. (12 Lea), 316.

The statement of counsel as to the effect of these cases cannot be accepted without qualification. Without undertaking to analyze these decisions, we are satisfied that they go no further than to declare that the power of the life tenant to dispose of the property at death as she pleases enlarges the estate into one in fee simple, when the power of disposition is not otherwise restricted.

Indeed, in *David* v. *Bridgman, supra,* the first of these cases, the circumstances detailed by the court affirmatively indicated that the testator did not wish the life tenant's power of disposition restricted to the time of her death. The life tenant in that case was the testator's wife, an old woman, and the will gave to her a store and stock of goods. It was not reasonable to believe that the testator intended that this old lady should operate the business. Perhaps it may be said that the surrounding circumstances disclosed by the record reflected upon the intention of the testator in the will construed in *Turner* v. *Durham, supra. Troup* v. *Hart, supra,* merely follows *David* v. *Bridgman,* and is not a reasoned opinion. We may observe that there were dissenting opinions both in *David* v. *Bridgman* and in *Troup* v. *Hart.*

The power given to a life tenant to dispose of the estate by will is clearly a qualified power of disposition, and does not enlarge the life estate into a fee. *McKnight* v. *McKnight,* 120 Tenn., 431, 115 S. W., 134. Likewise, although the power of disposition be described as a power on the part of the life tenant to dispose of the property

at death, if there are other provisions in the will indicating the desire of the testator that the disposition by the life tenant should only be made at death, the life estate is not enlarged into a fee. *Henderson* v. *Vaulx, supra.*

It has been laid down in several decisions of this court that the absolute power of disposition in a first taker, which will defeat a limitation over, may be given not only by express words, but by words necessarily implying an unlimited power of disposition. *Eaton* v. *Nashville Trust Co.,* 145 Tenn., 575, 238 S. W., 865; *Overton* v. *Lea,* 108 Tenn., 505, 68 S. W., 250; *Bradley* v. *Carnes,* 94 Tenn., 27, 27 S. W., 1007, 45 Am. St. Rep., 696; *Booker* v. *Booker,* 24 Tenn. (5 Humph.), 505.

If this unlimited power of disposition can arise by implication to bring the case within the rule of *Smith* v. *Bell, supra,* a rule not favored, for a stronger reason, a limitation upon the power of disposition can arise by implication to bring the case within the rule of *Henderson* v. *Vaulx,* a rule favored by the court as tending to effectuate the intention of the testator.

With these principles in mind, we take up the provisions of the testator's will. The record discloses that Eugene Magevney, while a scholarly man, was a schoolteacher, not a lawyer. It seems to us that the intention on his part to restrict the gift to Mrs. Hamilton, then Mrs. Dawson, to a life estate, unmistakably appears from this will.

In item 2 of the will the testator gives the property on Adams street and the property on Union street to his wife, "during her natural life." In the same item he says: "It is my will that she dispose of the lot on Poplar St., and use the proceeds when and how she wishes."

The foregoing shows that the testator took a clear distinction between a life estate and an absolute estate. He understood that the life tenant could not dispose of the estate given and use the proceeds as she pleased. When, by implication, he gave to his wife the Poplar street property, to make things plain, he conferred upon her the right to sell and to use the proceeds according to her wishes.

By item 3 of the will he gives to his daughter Sister Mary Agnes, an annuity during her life of two thousand dollars, a charge on his entire estate. He does this, as he explains, because his daughter has "withdrawn herself (prudently) from the ever annoying troubles of this annoying and business life of viz. attending to renting, leasing and keeping business houses in repair." The bulk of testator's property consisted of business houses, and his idea, as the provision for Sister Mary Agnes indicates, was that the recipient of these business houses, under his will, would be burdened with the duty of renting and leasing them and keeping them in repair—a rather strong indication that testator did not intend the business houses to be disposed of by the devisee of such property.

We again set out item 6 and item 7:

"6th. It is my will that the residue of my property both real and personal become the property of my daughter Kate Magevney (*alias*) Kate Dawson, during her life, and at her demise dispose of it as she pleases, this I bequeath to her sole and separate use, not to be subject to the contract of any husband she may have or marry, nor in any wise liable for his debts or contracts, but to the exclusion of all marital right of her husband.

"7th. It is my will that the stocks owned by me, and standing to my credit in the banks or offices in the City of

Memphis, with other available means, may be used in improvements on Adams Street if she ever deems it proper to do so."

Item 6 lumped the real and personal property. It gave the whole, as a separate estate, to Mrs. Hamilton "during her life, and at her demise, dispose of it as she pleases."

Item 7 provided that the stocks owned by testator and other available means "may be used in improvements on Adams Street if she (admittedly Mrs. Hamilton) ever deems it proper to do so."

We have then a will in which the testator gives all his property, real and personal, to his daughter for life. She is given the right to dispose of it all at her demise. Testator then adds that she may dispose of the personal property at any time (if ever she deems it proper) for a particular purpose. The implication is inevitable that the testator did not intend that this daughter should dispose of the real property prior to her death and that he did not intend she should dispose of the personal property except for the particular purpose, to-wit, "improvements on Adams Street."

The gift of the estate to Mrs. Hamilton for life of all the property, by force of the terms employed, was a general restriction upon her right of disposition. The power given her to dispose of this property at her death was an exception to this general restriction. The power given her to dispose of the personal property for a particular purpose was another exception to this general restriction. Item 7 deals with a portion of the property passing under item 6, and the two clauses must necessarily be read together.

There is no rule better established with reference

to the construction of written instruments than that the exception of particular things from general words shows that the things excepted would have been within the general language, had the exceptions not been made. *Evans* v. *McCabe, Com'r,* 164 Tenn., 672, 52 S. W. (2d), 159, 617; *Turner* v. *Eslick,* 146 Tenn., 236, 240 S. W., 786, and authorities reviewed in these cases.

That is to say, had testator not conferred upon Mrs. Hamilton the right to dispose of all the estate at her demise and the right to dispose of the personal estate during her life for a particular purpose, the general restriction on her power of disposition, implied in the gift to her for life, would have prevented any disposition by her at all. Express exceptions exclude others.

If it be said that, interpreted by *David* v. *Bridgman,* item 6 imposes no restriction on the power of disposition, the answer is that testator has left no room for interpretation. He made it evident by item 7 that he understood himself in item 6 to have restrained the daughter from disposing of all the property until her death. Otherwise, why the permission to dispose of part of the property during her lifetime? Item 6 does not stand alone.

In *Booker* v. *Booker, supra,* property was given to testator's son "not to be disposed of until he is twenty-five years of age, except by consent of my executors." It was observed: "When it is said, he is not to dispose of it until he arrived at the age of twenty-five years without the consent of the executors, it is implied that he may dispose of it, with their consent, before he is twenty-five, and that after he arrives at that age he may make such disposition without their consent." It was further said in the same case: "We cannot more clearly express our approbation that a thing may be done, than to forbid it ex-

cept upon the happening of a certain event. All men would understand that upon the event happening, the right to do the thing had been granted.''

By analogy, we cannot more clearly express our disapprobation that a thing may be done than to permit it only upon the happening of a certain event. It follows that the permission here given to Mrs. Hamilton to use part of the property in a certain event and for a certain purpose destroys the idea that she was to have authority to use the other property for such purpose or to use it at all.

 It is a familiar principle in the construction of every writing that all portions of that writing are to be taken into account and effect given to every part thereof if possible. The construction of the will for which Mrs. Karsch contends makes item 7 useless, not to say absurd. We cannot disregard the language used in item 7 of the will. We again ask, For what purpose could testator have given the daughter permission to use the stocks and other available means for improvements on Adams street, if he had intended by item 6 to give her an absolute title to all the property with an unqualified power of disposition?

Furthermore the purpose for which she was permitted to use the personal property, to-wit, the improvement of the Adams street realty, confirms our conclusion that it was the intention of testator that his real estate should be preserved, indeed, that all his estate should be preserved, during the life of Mrs. Hamilton.

The Court of Appeals was of opinion that the provisions of items 3, 4, and 5 of the will giving annuities to Sister Mary Agnes, testator's sister, Kate Lilly, and to the orphans of St. Peter's Church, made of Mrs.

Hamilton, as executrix of testator's will, a trustee with respect to the property covered by item 6, charged with the duty of paying these annuities out of the estate; that the property was thus burdened with a trust and that Mrs. Hamilton for this reason did not have full power of disposition with respect thereto and accordingly did not take an absolute estate.

We find it unnecessary to discuss this theory, since, for the reasons stated above, we think the will otherwise unmistakably negatives the contention that Mrs. Hamilton took absolute title to property included in item 6.

The Court of Appeals was further of opinion that, upon the death of Mrs. Hamilton, the property covered by item 6 passed to the heirs of Eugene Magevney, to be ascertained at the time of Mrs. Hamilton's death.

We agree with the Court of Appeals that the estate of Eugene Magevney, included in item 6, must be now disposed of as intestate property, but we do not agree that the heirs are to be determined as of the death of Mrs. Hamilton. We find no authority to support this idea.

Under all the cases we have seen, when a power of appointment created by a will terminates without having been executed, and there is no limitation over, the subject-matter of the power is said to remain in the donor. He is intestate with respect thereto. It passes to his heirs or next of kin to be ascertained as of his death, not to his heirs or next of kin at the time of the contingency producing the intestacy. We do not see how the rule could be otherwise. When the life tenant in this case failed to exercise the power of appointment conferred upon her, the matter stood just as if her father had conferred no such power. That is to say, he died

without any disposition of the inheritance in this property—the reversion after the death of Mrs. Hamilton.

Some of the leading cases to this effect (and we find none to the contrary) are *Fontain* v. *Ravenel,* 17 How., 369, 15 L. Ed., 80; *Greenland* v. *Waddell,* 116 N. Y., 234, 22 N. E., 367, 15 Am. St. Rep., 400 (this was the rule in New York regardless of statute); *Hoes* v. *Van Hoesen,* 1 Barb. Ch. (N. Y.), 379; *In re Kate,* 2 Barb. Ch. (N. Y.), 375; *Bradford* v. *Andrew,* 308 Ill., 458, 139 N. E., 922; *Johnson* v. *Snyder,* 82 Ind. App., 215, 142 N. E., 877; *Harrison* v. *Battle,* 21 N. C., 213; *Crossling* v. *Crossling,* 2 Cox. Ch., 397, 30 Eng. Reprint, 183; *Halfhead* v. *Sheppard,* 1 El. & El., 918, 120 Eng. Reprint, 1155; *Emblyn* v. *Freeman,* Prec. Ch., 541, 24 Eng. Reprint, 243.

This court has reached a similar conclusion in holding that members of a class, to whom the subject-matter of a power is limited, are to be ascertained, on default of execution, as of the death of the testator. *Bridgewater* v. *Turner,* 161 Tenn., 111, 29 S. W. (2d), 659; *Cruse* v. *McKee,* 39 Tenn. (2 Head.), 1, 73 Am. Dec., 186.

The complainants insist that under three decisions of this court, where the inheritance or reversion is undisposed of by the donee of the power of appointment, the donee being the life tenant, the heirs of the donor are to be ascertained at the time of the life tenant's death.

The cases relied on are *Starnes* v. *Allison,* 39 Tenn. (2 Head), 221; *Jourolmon* v. *Massengill,* 86 Tenn., 93, 5 S. W., 719, 723; *McKnight* v. *McKnight,* 120 Tenn., 431, 115 S. W., 134, 135. We are unable to agree with counsel that any of these cases can be so interpreted unless it be *McKnight* v. *McKnight,* which, to the extent the language used therein tends to support such contention, must be disapproved or distinguished.

In *Starnes* v. *Allison* the court construed the will as giving property to testator's only daughter to her separate use for life, with power on her part to dispose of it by will. The will did not provide against the failure of the daughter to exercise her power of appointment. The daughter and her husband undertook to make a sale of the property so given to her by a deed in which they joined. The intending purchaser declined to accept the deed on the ground that it did not convey a good title. A bill was filed for specific performance which the chancellor sustained, but the suit was dismissed by this court. The case is not very fully stated in the opinion. It appears that John Marshal and W. F. Cooper represented the complainants and Neil S. Brown and others represented the defendants. The reputation of these lawyers still lives, and we may be assured that nothing was overlooked in the presentation of the cause. The court denied the right of the daughter, joined by her husband, to make this deed, which conveyance if sanctioned would have defeated the intention of the testator in undertaking to secure her well-being.

The theory of the complainants in that case, although not disclosed by the opinion, must have been that, the testator having died without any disposition of the reversion to the property given his daughter for life, this reversion, or the fee, passed to his daughter, and her equitable life estate became thereupon merged into the fee and gave her the right to convey, her husband joining.

This decision does not mean that there was any suspension of the vesting of the inheritance after testator's death. The rule is well settled in Tennessee and elsewhere that the merger of an equitable title into the

legal title will not be permitted where the result would be to defeat the intention of the grantor or testator. *Winters* v. *March,* 139 Tenn., 496, 202 S. W., 73; *Henderson* v. *Hill,* 77 Tenn. (9 Lea), 25; *Henson* v. *Wright,* 88 Tenn., 501, 12 S. W., 1035; 21 C. J., 1037; and note in 7 Ann. Cas., 700, where many decisions are collected. Such must have been the basis of the judgment in *Starnes* v. *Allison.*

*Jourolmon* v. *Massengill, supra,* is the well known spendthrift trust case. The devise there was to a trustee for the use of testator's son, free from the son's debts and without power on the part of the son to sell the property or any part thereof; the son to have the rents and profits for his support and the right to dispose of the property by his last will and testament. The testator made no disposition of the reversion in default of the exercise by the son of the power of appointment by will.

The principal discussion in that case was as to the validity of a spendthrift trust; that being the first decision of this court which definitely sanctioned such a disposition of property. It seems that judgments had been procured against testator's son and executions levied on the property. The court held that the execution creditors took nothing. It is urged that in so deciding the court must have premised that the undisposed of reversion did not vest in the son upon the father's death. Counsel, however, are mistaken in saying that the creditors were repelled for this reason, Judge LURTON, writing the opinion in *Jourolmon* v. *Massengill,* shortly thereafter wrote for the court the opinion in *Henson* v. *Wright,* 88 Tenn., 501, 12 S. W., 1035. In the latter case the following appears:

"If any trust or duty is imposed on the trustee, either expressly or by implication, the trust is an active one;

and in such case there is no merger of the legal and equitable estates, and the interest of the beneficiary, not being a legal one, is not subject to levy of execution."

For this proposition Judge LURTON cited *Jourolmon* v. *Massengill.*

It is true, in *Jourolmon* v. *Massengill,* the court said that, in default of the power of appointment by will, "upon the death of the son the estate would descend to the heirs of the testator, not the heirs of the son." The court did not, however, undertake to say as to what time the heirs of the testator were to be ascertained.

There is nothing in *Jourolmon* v. *Massengill* to justify the argument that a title like the one before us is to be held in abeyance after the death of the testator and until the death of a life tenant. The execution creditors in *Jourolmon* v. *Massengill* took nothing, not because the title to the inheritance had not vested, but because the court did not permit a merger between the legal title and the equitable title which would have defeated the intention of the testator.

In *McKnight* v. *McKnight,* the testator gave his real estate to his wife for life with full power to dispose of one-half of it by will. He directed that the other one-half of his real estate, at the death of his wife, should be sold and the proceeds go absolutely one-third to his brother, Robert E. McKnight, another one-third to his sister, Josie Gilmer, and the remaining one-third share and share alike to the children of his deceased brother, S. H. Mc-Knight.

By a further clause of his will, testator provided that, should his brother, R. E. McKnight, die in the meantime "leaving children or the descendants of children, then his one-third as herein devised shall go and descend to

his children equally, any grandchildren representing their respective parent and inheriting his or her share; and the same method of division, inheritance and subdivision I desire and direct to be observed in regard to the bequests of the other thirds in the event of their deaths.''

The court in this case held that the wife did not take an absolute estate in the one-half of the realty which she was authorized to dispose of by will, but that she took merely a life estate with the power of appointment by will as aforesaid. The bill was filed in *McKnight* v. *McKnight* for a construction of testator's will, and in the course of the opinion it was said:

''It is immaterial that no disposition is made of the fee of the one-half Mrs. McKnight is empowered to devise. It, like the fee in the other half, stands in abeyance until her death, when it either vests in her appointee, or the heirs at law of the testator.''

We forbear comment on the statement as to when title to the ''other half'' vested. The statement as to the title to the half over which the wife had power of disposition standing in ''abeyance until her death'' is not supported by any authority and was doubtless an inadvertence. This we say on the assumption that by the word *''fee''* was meant the legal title, as counsel think. Recalling the accuracy of statement customary with the writer of the opinion, we think it more likely he used *fee* in the sense of fee simple, indefeasible, the whole estate, not subject to any life interest, nor subject to be defeated by any power of appointment. Such a title as that would not have ripened until the widow's death.

The complainants' position would not be at all strengthened if we adopted their theory that Mrs. Hamilton took title to this property as trustee. Under a long

line of our decisions, collected in *Winters* v. *March,* 139 Tenn., 496, 202 S. W., 73, a trustee in this state takes exactly that quantity of interest which the purposes of the trust require. Under no aspect of the case could any trust be regarded as impressed on this property beyond the life of Mrs. Hamilton—she being the surviving beneficiary—even if she was charged with keeping up the property for the benefit of those subsequently entitled to it. Therefore, if Mrs. Hamilton was the trustee, all the trusts being discharged, her title as such expired with her death. She could not have taken title to the reversion, for, as we construe the will, the reversion was not devised. It was intestate property and vested like other intestate property upon the death of the testator.

Even, however, if it should be conceded that, as trustee, Mrs. Hamilton took title to the entire legal estate, as to the reversion she would have held the property for the use of testator's heirs ascertained as of the date of his death. *Harrison* v. *Battle, supra; Crossling* v. *Crossling, supra.*

Vestiture of this inheritance upon the death of testator could have defeated no intention disclosed by his will. The legal title vested in Mrs. Hamilton and Sister Mary Agnes. The beneficial interest went to Mrs. Hamilton, subject to the charges laid thereupon and to the limitations imposed. No merger resulted, as we have seen. There being no union of the legal title and the beneficial interest, no execution could have reached the land. *Henderson* v. *Hill, supra.* The beneficial interest being limited to Mrs. Hamilton for life and to her separate use, no conveyance of the land could have been made. *Starnes* v. *Allison, supra.*

Upon the whole case we are of the opinion that the adopted daughter of Mrs. Hamilton takes the personal property involved herein as Mrs. Hamilton's statutory distributee; that upon the death of Eugene Magevney one-half of the reversion of the property covered by item 6 of the will passed to Mrs. Hamilton and that the other one-half passed to Sister Mary Agnes, subject to the power of appointment. There having been no exercise of the power, and Mrs. Hamilton and Sister Mary Agnes both being dead, one-half of the property covered by item 6 passes to the adopted daughter of Mrs. Hamilton and the other one-half of the property covered by item 6 passes under the will of Sister Mary Agnes.

The decree of the Court of Appeals is modified accordingly.

NOTE 1.—The following are the cases relied on by complainants for the proposition that jurisdiction must appear of record to give integrity to the judgment of a court of general jurisdiction acting under a statute conferring special powers. We omit the cases under the statute authorizing the sale of a decedent's lands for debts. In none of the others was the procedure to be followed according to the course of common-law or equity practice.

*Singleton* v. *Bell,* 3 Tenn. (Cooke), 267; *Jones* v. *Read,* 20 Tenn. (1 Humph.), 335; *Haynes* v. *Gates,* 39 Tenn. (2 Head), 598; *Curry* v. *Munford,* 52 Tenn. (5 Heisk.), 61; *Anderson* v. *Binford,* 61 Tenn. (2 Baxt.), 310; *Wynne* v. *Taylor,* 52 Tenn. (5 Heisk.), 691; and *Phillips* v. *Landess,* 152 Tenn. 682, 280 S. W., 694—were summary proceedings on motion.

*Miller's Lessee* v. *Holt,* 1 Tenn. (1 Overt.), 50, was a statutory proceedings to correct error in the survey of a grant. The court showed the procedure to be summary,

and expressly for this reason held the statute must be strictly followed.

*McCarrol's Lessee* v. *Weeks,* 6 Tenn. (5 Hayw.), 248; *Hamilton* v. *Burum,* 11 Tenn. (3 Yerg.), 355, and *Condon* v. *Galbraith,* 106 Tenn., 14, 58 S. W., 916, all involved statutory proceedings for the collection of delinquent taxes. The statutes before the court, and all statutes, so far as we know, providing for the collection of such taxes, prescribe summary methods. The necessities of government so require. *McCarrol's Lessee* v. *Weeks, supra; East Tennessee Brewing Co.* v. *Currier,* 126 Tenn., 535, 150 S. W., 541.

*Bleidorn* v. *Pilot Mountain C. & M. Co.,* 89 Tenn., 166, 204, 15 S. W., 737, involved a statute authorizing proceedings upon publication, without service of process.

*Cooper* v. *Summers,* 33 Tenn. (1 Sneed), 453, dealt with appeals from county court proceedings upon inquisitions of lunacy. *Brewer* v. *Griggs,* 10 Tenn. App., 378, held that the county court was not a court of general jurisdiction in such matters.

*New York Casualty Co.* v. *Lawson,* 160 Tenn., 329, 24 S. W. (2d), 881, was a suit brought under the attachment laws without issuance of summons.

NOTE 2.—Counsel for Mrs. Karsch rely on *Skillin* v. *Loyd,* 46 Tenn. (6 Cold.), 563. That case does not help them. The court there refused to cut down the fee given by doubtful words following. Here a life estate was given and the effort is to enlarge that estate by subsequent words.

*Green* v. *Young,* 163 Tenn., 16, 40 S. W. (2d), 793, is likewise inappropriate. That case rested mostly on Shannon's Code, section 3672, providing that every devise or grant should pass all the estate of the devisor or gran-

tor "unless the intent to pass a less estate or interest shall appear by express terms, or be necessarily implied in the terms of the instrument." As we have heretofore shown, the contrary implication is quite obvious in the instrument before us. Moreover, the court has since declined to accept the quotation in *Green* v. *Young* ascribed to Ruling Case Law as a correct statement of a general rule, without notation of the exception above quoted from the Code. *Williams* v. *Williams* (Tenn. Sup.), 65 S. W. (2d), 561, decided to-day.